980 A.2d 488 (2009)
410 N.J. Super. 159
NEW JERSEY DEPARTMENT OF YOUTH AND FAMILY SERVICES, Respondent,
v.
J.L., Appellant.
Docket No. A-1103-08T2
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2009.
Decided October 1, 2009.
James Herman, Cherry Hill, argued the cause for appellant.
Lori J. DeCarlo, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. DeCarlo, on the brief).
*489 Before Judges CUFF, PAYNE and WAUGH.
The opinion of the court was delivered by
PAYNE, J.A.D.
Defendant, J.L., appeals from an August 25, 2008 final determination by the Director of the New Jersey Division of Youth and Family Services (DYFS) that, on April 18, 2005, defendant had committed an act of child neglect as defined by N.J.S.A. 9:6-8.21c(4)(b) by failing to adequately supervise her two young sons. On appeal, defendant raises the following issues:
I. THE DYFS AGENCY DETERMINATION OF SUBSTANTIATED CHILD NEGLECT IS ARBITRARY, CAPRICIOUS AND/OR UNREASONABLE OR VIOLATED LEGISLATIVE POLICY.
II. DYFS FAILED TO PROVIDE DUE PROCESS IN INITIAL PROCEDURE.
III. DYFS VIOLATED LETTER AND SPIRIT OF EXTENSION STATUTE FOR FILING OF FINAL DECISION SO INITIAL DECISION SHOULD BE FINAL.
Following a review of the record in this matter in light of applicable precedent and the arguments of counsel, we reverse.
J.L., a thirty-nine-year-old former schoolteacher, is married to M.L. a physician. The couple have two sons. At the time of the incident in question, one was almost six years of age, having been born in August 1999, and the other was almost four years of age, having been born in August 2001. The family lived in a condominium complex that had a recreational area comprised, successively, of an all-purpose court, then three tennis courts, and, finally, a children's play space. Prior to the incident, the older boy had been engaged in a water fight, with J.L.'s assent. Having become wet as a result, the child asked J.L.'s permission to return home and change. At the same time, the younger boy told J.L. that he needed to use the bathroom. J.L. permitted the boys to return home alone, watching them as they proceeded through the recreational area and into the condominium, which could be viewed clearly from where J.L. was standing. The boys did not have to cross any streets to reach their home. J.L. remained in the play area, chatting with a friend whose daughter was playing nearby while she awaited her sons' return.
J.L. had left her front door unlocked, and had trained the boys to leave it ajar if they entered without her. However, on this occasion, the door closed. Because the front inside door knob was equipped with a child-proof cover, the boys were unable to open the door. Believing it to be locked, at 5:38 p.m. the older boy called 9-1-1. At 5:48, the police arrived at the house, knocked, and then opened the door. The older boy, who apparently made a second 9-1-1 call at 5:52 p.m., was on the telephone. According to the police report,
[E.L., the older boy] appeared to have been crying. I asked him why he called us and he replied, "Because [S.L.] locked me in, mommy only knows how to open the door and she wasn't here so I was scared." Both [E.L.] and [S.L.] appeared to be o.k. I checked the residence to see if there was anyone else in the residence or back porch with negative results.
In the meantime, J.L., realizing that the children had not returned and that dinnertime was approaching, picked up the boys' bikes, helmets, a pail of chalk, and a ball and commenced to walk home. As she approached her residence, she noticed the police at her door. The police report indicates *490 that J.L. returned at 6:11 p.m., approximately one-half hour after her son's first 9-1-1 call. Upon her return, J.L. was informed that the incident would be documented and that DYFS would be contacted.
The police waited approximately six hours to inform DYFS of the incident, calling it at 11:20 p.m. The DYFS worker, regarding the matter as non-emergent, assigned it a twenty-four hour response time. Between April 19 and 27, 2005, DYFS conducted an investigation of the matter, pursuant to N.J.S.A. 9:6-8.11, which included inquiries to the older child's school and the younger child's day care center and to their pediatrician. The school's guidance counselor said she was "very surprised" by the Division's call, reporting no problems with the older boy and adding that J.L. volunteered at the school. Similarly, the day care facility reported no difficulties and stated that J.L. was "very involved with the children." The pediatrician's office indicated that the boys were current on their immunizations and had been seen within the year.
Additionally, DYFS conducted interviews of J.L. and her husband and interviews of the boys outside of their parents' presence. The DYFS worker described her conversation with the older boy regarding the incident as follows:
He said he was at the park and his shirt was wet and he came to get another shirt and he put on his rainbow shirt. Worker asked where the playground was. [E.L.] said it was right outside and then pointed to it. Worker looked out the window and could see it from there. He said that when they were in the house that his brother locked the door. Worker asked when he called 911. He said when his brother locked the door that is when he called 911. Worker asked him is he normally home alone. [E.L.] stated he was not and that his mom is usually home and that his dad is sometimes home. Worker asked if he remembered what happened after he called 911. He said he remembers talking to the police but he didn't really remember anything else.
The younger boy, described by the DYFS worker as "a little ball of energy," told the worker that his brother had called the police, but that he did not remember what had happened. The father confirmed that his wife was a stay-at-home mom who was always with the children when they were not in school.
In addition to the interviews, DYFS conducted a Safety Assessment, a Risk Assessment, and Caregiver and Child Strengths and Needs Assessments. The agency concluded as a consequence that no safety interventions were required; that the total neglect risk score was 1, representing the incident at issue; that the risk of neglect or abuse was "low"; and that no services were required.
At the conclusion of its investigation, the DYFS worker issued a report, countersigned by her supervisor, substantiating neglect, but determining that the "[c]hildren are not at risk and are safe at home with their mother and father," and closing the DYFS file in the matter. The case was not referred to the prosecutor for possible criminal action.
In a letter dated April 27, 2005, J.L. was advised that DYFS had "determined that child abuse was substantiated," and that she had been "identified as harming the child or placing the child at risk of harm." J.L. was additionally advised of her right to appeal through a request for a Regional Dispositional Conference or an Office of Administrative Law hearing. As a final matter, the letter stated that the police would be notified of the substantiated charges and J.L.'s name would be placed *491 on the Division's Central Registry. It stated:
Please be advised that under N.J.S.A. 9:6-8.10a, as amended August 1, 1997, the Division is required to send to local/State police certain identifying information regarding all substantiated incidents of child abuse and neglect in their jurisdiction. In addition, N.J.S.A. 9:6-8.10a authorizes the Division to identify perpetrators of child abuse or neglect to agencies, persons or entities who are mandated by statute to consider such information when conducting background screenings of employees, prospective employees, or volunteers who provide or seek to provide services to children. For certain employment a substantiation of child abuse or neglect will result in automatic elimination from employment consideration.
On May 2, 2005, DYFS acknowledged J.L.'s request for a Regional Dispositional Conference/Review. J.L. was informed that the process included "an opportunity for you to provide information, which may be considered in the Review. Input may be offered either by telephone interview, written statement, or in a meeting." J.L. was also advised of the Review Officer's intent "to contact you to arrange for your input" when she was able to work on the appeal. J.L. was told: "I will share case record information with you and consult with you as to your choice of input method."
Despite the foregoing assurances, on December 7, 2006, nineteen months after the May 2 letter, a DYFS administrative review officer wrote to J.L. to inform her that a "record and document review" of her case had been completed and that the local office's decision had been affirmed. At no time was J.L. asked to provide input with respect to this determination, which was unilateral in nature, nor was she provided with the documents comprising her case.
J.L. retained counsel who, on December 26, 2006, wrote to the administrative review officer objecting to the administrative finding on due process grounds and seeking its withdrawal, demanding discovery, and requesting a re-hearing or, in the alternative, review in the Office of Administrative Law (OAL).
On February 9, 2007, J.L.'s appeal was transmitted to the OAL. The parties agreed that the matter could be heard on the basis of a stipulation of facts and documentary evidence, including records of the DYFS investigation and police reports. The joint stipulation and documents were filed with the OAL on October 17, 2007, and the record was closed on November 15, 2007.
On March 10, 2008, almost three years after the incident at issue, a decision was issued by the Administrative Law Judge (ALJ) assigned to the matter. In that decision, the ALJ noted that, in G.S. v. Department of Human Services, 157 N.J. 161, 723 A.2d 612 (1999), the New Jersey Supreme Court had held that a gross negligence standard should be employed in determining whether the parent or guardian had failed to exercise a "minimum degree of care" and therefore had committed an act of child abuse or neglect pursuant to N.J.S.A. 9:6-8.21c(4). He then concluded that J.L.'s conduct "falls well shy of this threshold. Even watchful parents find it a near impossibility to be aware of a child's movements at every turn. Were the rule as the Division suggests, the central registry would bulge with well intentioned and careful parents."
DYFS sought further review of the ALJ's decision. After three ex parte applications for an extension "due to the complicated issues" presented, on August 25, 2008, three years and four months *492 after the incident at issue, the Director of DYFS rejected the ALJ's recommended disposition and, in a final decision, affirmed the Division's finding of substantiated child neglect. In doing so, the Director cast the ALJ's decision as turning on whether J.L.'s name should be placed in the Central Registry when it properly should have been focused on whether J.L. committed child neglect by failing to supervise her two sons. In this regard, the Director noted that "[t]his incident was not one where the children were incapable of creating a harm to themselves," since once inside the home, they had unfettered movement and could create a hazardous condition "without possessing the maturity to cope with it." The Director concluded "E.L.'s call to '911' is indicative that the children were stressed, and incapable of fending for themselves." Additionally, she noted that J.L. was unaware that the police had entered the home. As the Director observed, this was not an emergency situation in which J.L. was prevented from accompanying her children. Moreover, this was not a situation where J.L. "maintained supervisory attention on her residence" after allowing her children to return to it. Her attention was diverted for at least thirty minutes. The Director concluded:
Both children were terrified and placed at risk of harm, and their physical, mental, and emotional condition was in imminent danger of being impaired as a result of J.L.'s actions Further, leaving 5- and 3-year-old children alone unsupervised for 30 minutes or more is so serious that it rises to the level of risk of harm defined by the statute at N.J.S.A. 9:6-8.21(c)(4). The Division cannot, and should not, be obligated to passively stand by and await injury to a child before having the statutory authority to act.

I.
In G.S., the Supreme Court set forth the established principles governing appellate review of final decisions such as this, stating:
Reviewing courts should give considerable weight to an agency's interpretation of a statute the agency is charged with enforcing. Appellate courts, however, are not bound by an agency interpretation of a strictly legal issue, Mayflower Securities Co., Inc. v. Bureau of Securities in Division of Consumer Affairs of Dept. of Law and Public Safety, 64 N.J. 85, 93, 312 A.2d 497 (1973), when that interpretation is inaccurate or contrary to legislative objectives.
[G.S., supra, 157 N.J. at 170, 723 A.2d 612.]
Further, we will not upset an agency determination "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the [governing] act." Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). Because this matter was decided on a stipulated record, we have no occasion to defer to credibility determinations by the ALJ, there being none. What is at issue here is whether the stipulated conduct of J.L. constituted, as a matter of law, gross negligence as defined in G.S. We hold that it did not.
The statute at issue defines an abused or neglected child as one less than eighteen years of age "whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship [or] by unreasonably inflicting or allowing *493 to be inflicted harm, or substantial risk thereof. . . ." N.J.S.A. 9:6-8.21c(4). G.S. concerned the issue of whether a child care worker who administered seventy-eight times the prescribed dose of an anti-hyperactive drug to an autistic, non-verbal, epileptic, developmentally disabled minor in her care failed to exercise a minimum degree of care for the child thereby committing an act of child neglect. In interpreting this phrase, the Court held:
The phrase "minimum degree of care" denotes a lesser burden on the actor than a duty of ordinary care. If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable. The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton.
[G.S., supra, 157 N.J. at 178, 723 A.2d 612.]
The Court noted that conduct is willful or wanton if it is "done with the knowledge that injury is likely to, or probably will, result." Ibid. It noted additionally that "[b]ecause risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful." Ibid.
[T]he difference between merely negligent conduct and wanton and willful misconduct cannot be described with mathematical precision. [McLaughlin v. Rova Farms, Inc. 56 N.J. 288, 305, 266 A.2d 284 (1970).] "Like many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and the purpose of its use." Fielder v. Stonack, 141 N.J. 101, 124, 661 A.2d 231 (1995). The label turns on an evaluation of the seriousness of the actor's misconduct.

McLaughlin, supra, 56 N.J. at 306, 266 A.2d 284.
[Ibid.]
As a further matter, the Court held that: "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Id. at 179, 723 A.2d 612.
According to the G.S. Court, "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181, 723 A.2d 612. Whether the parent has exercised the requisite degree of care is to be analyzed in light of the dangers and risks associated with the particular situation at issue. Id. at 181-82, 723 A.2d 612. The inquiry must focus on the harm to the child and "whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." Id. at 182, 723 A.2d 612.
As the result of our review of the record, we are satisfied, in this case, that J.L.'s conduct, although arguably inattentive or even negligent, did not meet the requisite standard of willful or wanton misconduct. In this regard, we note that the children were almost four and almost six years of age, respectively. They were returning to a home that was within view of their mother, and they were not required to cross any streets to reach it. The home, itself, was deemed safe by DYFS, and with the exception of this incident, J.L.'s conduct toward her children was deemed appropriate. Indeed, DYFS offered no services to J.L. or her family, did not refer the matter to the prosecutor, did not remove the children from the home, and it closed its file following its initial *494 investigation. The investigating police officer found the matter to be sufficiently inconsequential that she delayed notification to DYFS by six hours; DYFS permitted investigation to commence within twenty-four hours, not the two-hour period prescribed in emergent matters. N.J.A.C. 10:129-2.3.
DYFS argues on appeal that J.L.'s conduct was grossly negligent because of the potential for harm to the children when they were unsupervised: "In the case of emergency, neither child could have escaped the home to safety outside or even obtain[ed] assistance from J.L. or another adult. . . . These perils and other[s] can happen in a matter of mere seconds, and illustrate why children of tender years must be properly supervised by an adult." However, the standard is not whether some potential for harm exists. A parent fails to exercise a minimum degree of care when she is "aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child." G.S., supra, 157 N.J. at 181, 723 A.2d 612.
Further, J.L.'s conduct in this case caused, at most, transitory upset to the older child, whom the police believed to have been crying prior to their entry and who stated that he was "scared." The DYFS worker's interviews with the two children on the day following the incident discloses no evidence of lasting harm, or even a lasting recollection of what had occurred. The Director's finding to the contrary that "[b]oth children were terrified" has no support in the record.
In support of its determination that neglect was demonstrated, DYFS cites to the DYFS Field Operations Casework Policy and Procedure Manual at 306.4, which defines inadequate supervision of a child as "[a] child left without adult supervision when the child's age, mental or physical conditions do not permit him to provide for his own food, to exercise good judgment, to prevent or deal with emotional or physical crisis or to control his behavior." However, this is not the standard set forth in G.S. See G.S., supra, 157 N.J. at 178-82, 723 A.2d 612. Moreover, we note that in this case, when confronted with an emergent situation, the older child reasonably determined to call 9-1-1, as he undoubtedly had been instructed to do. These circumstances suggest that the child exercised good judgment and was well trained by his parents to deal with the crisis that he perceived to exist.
Accordingly, we reverse the final decision of the Director and order that J.L.'s name be removed from the Central Registry and police records.

II.
In her appeal, J.L. also raises a due process challenge to her placement on the Central Registry prior to a hearing and final determination of her case. Such placement is mandated by N.J.S.A. 9:6-8.11, which requires that substantiated reports of child abuse or neglect be forwarded to the Central Registry within seventy-two hours after substantiation has occurred. The difficulty with this procedure is that a person's inclusion in the registry pending a final determination of Abuse or neglect may then be disclosed in a multitude of employment and non-employment settings set forth in N.J.S.A. 9:6-8.10a and in other circumstances, many of which are enumerated in our opinions in Matter of East Park High School, 314 N.J.Super. 149, 156-59, 714 A.2d 339 (App.Div.1998) and New Jersey Division of Youth & Family Services v. M.R., 314 N.J.Super. 390, 399-402, 715 A.2d 308 (App.Div.1998). As the result of such disclosure, many employments involving the care of children are foreclosed to persons *495 whose names are on the registry, as well as eligibility to serve as a foster parent or to be a party to a private adoption.
We considered the due process implications of the statutory requirement for pre-hearing inclusion in the Central Registry in a footnote in Division of Youth & Family Services v. D.F., 377 N.J.Super. 59, 871 A.2d 699 (App.Div.2005). There, we noted that, after it had been disclosed at oral argument that a person's name could be placed on the Central Registry following an individual caseworker's determination that allegations of child abuse or neglect were substantiated, a post-argument certification by a DYFS employee was submitted that disclosed that the entry is initially coded as "pending administrative review." If the Administrative Review Officer upheld the initial findings, and the case was then appealed to the OAL, a different code is entered that indicates that the appeal is pending before an ALJ. After reciting this information, we then observed:
We are troubled by the fact that a person's name may be placed in the Central Registry based solely on a determination by an individual caseworker, particularly in view of the time and effort involved in challenging such a determination. We are also concerned that a sophisticated agency which is informed that its "request for Child Abuse Record Information is pending" may infer that this means the person about whom it has inquired has been identified as a child abuser. However, because this case comes before us on an appeal from a final decision of DYFS, these issues regarding the interim stages of a child abuse or neglect proceeding before DYFS are not directly before us. Moreover, those issues have not been adequately briefed. Therefore, we simply note that DYFS's procedures regarding the initial placement and maintenance of names in the Central Registry raise issues of procedural due process and administrative fairness that merit further attention. See Doe v. Poritz, 142 N.J. 1, 99-109, 662 A.2d 367 (1995).
[Id. at 64-65 n. 2, 871 A.2d 699.]
Unlike the situation presented in D.F., both parties in the present matter have briefed the issue raised. However, like D.F., J.L. did not present her constitutional challenge to interim registration either to DYFS or to a court by way of an order to show cause seeking a stay of registration. As a consequence, as in D.F., the issue is not directly before us, and we lack a full record upon which to base a ruling.
While for the reasons set forth we decline to decide the issue raised, we nonetheless note that our own inquiry at oral argument did not disclose any significant change in the procedures for handling interim postings from what was described in D.F. Thus, the issues of due process and procedural fairness that concerned us in D.F. remain.
We note as well that, in prior decisions, we have addressed issues similar to those raised by J.L. here. In East Park, supra, 314 N.J.Super. 149, 714 A.2d 339, we considered a teacher's challenge to her placement on the Central Registry without any type of hearing, but merely the opportunity to submit a statement to an investigatory body known as the Institutional Abuse Investigation Unit, an opportunity that she declined to accept.[1] In that case, we analyzed *496 the issue presented in light of the factors relevant to a procedural due process analysis set forth in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), adopted in New Jersey in J.E. on Behalf of G.E. v. State, 131 N.J. 552, 566, 622 A.2d 227 (1993). Mathews requires (1) our determination of whether there is a protectible liberty interest at stake; (2) our evaluation of whether there exists "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards"; and (3) our consideration of "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, supra, 424 U.S. at 335-36, 96 S.Ct. at 903, 47 L.Ed.2d at 33. We agreed with the aggrieved teacher that inclusion of her name in the Central Registry caused injury to the teacher's reputation and burdened her employment rights.[2]East Park, supra, 314 N.J.Super. at 160, 714 A.2d 339. An incursion on such liberty interests, we held, entitled the teacher to due process protections under the Federal and New Jersey constitutions. Id. at 160-63, 714 A.2d 339.
In considering Mathews's second factor, we held additionally that the process afforded by DYFS did not adequately test the charges "because the outcome depended upon a credibility evaluation of [the teacher] and the witnesses against her, who she was not allowed to cross-examine." Id. at 164, 714 A.2d 339. We held that even DYFS's revised procedures, which still did not allow for an administrative hearing to challenge a finding in a child abuse investigation, "allow[ed] a quasi-judicial determination of `disputed adjudicative facts' without a quasi-judicial proceeding to undergird it." Ibid. (quoting High Horizons Dev. Co. v. State Dept. of Transp., 120 N.J. 40, 53, 575 A.2d 1360 (1990)).
Finally, in considering Mathews's third prong, we noted:
it is without question that the government has a significant interest in keeping child abusers out of the ranks of child care workers. In re Allegations of Physical Abuse at Blackacre Academy, 304 N.J.Super. 168, 185, 698 A.2d 1275 (App.Div.1997). However, it has or should have an equal interest in not stigmatizing the innocent and foreclosing them from employment and other opportunities.
[East Park, supra, 314 N.J.Super. at 165, 714 A.2d 339.]
In the context of a case where the relief sought was an administrative hearing, we recognized the economic consequences to the government, but we held:
If a trial type hearing is the only viable method of testing the truth, then its cost must be borne by the public in a constitutionally governed society. That is the case here. Where an accused challenges the truthfulness of her accusers and contends, as a matter of fact, that the charge against her is false, she must be *497 allowed, as a function of due process, in addition to fair notice, to be present, to adduce evidence, to be represented by counsel, to confront the witnesses against her and to receive a written decision.
[Id. at 165-66, 714 A.2d 339 (citing Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 167, 390 A.2d 90 (1978)).]
In M.R., supra, 314 N.J.Super. 390, 715 A.2d 308, decided in the same year as East Park, we held in a split opinion that a mother who had requested a Regional Dispositional Conference, but was not afforded full discovery of the documents in the possession of DYFS and was merely permitted to give a statement at the conference, was entitled, additionally, to certain procedural protections at the conference[3] and to a subsequent trial type hearing before an ALJ. Judge Petrella, declining to reach the constitutional issues presented by the parties, concluded that fundamental fairness dictated that a hearing in accordance with the Administrative Procedure Act take place. M.R., supra, 314 N.J.Super. at 411-13, 715 A.2d 308. Judges Skillman and Eichen both recognized constitutional bases for the relief soughtJudge Skillman relying on federal constitutional provisions, id. at 420, 715 A.2d 308, and Judge Eichen relying upon the state constitution. Id. at 425, 715 A.2d 308.
In the present case, the issue is not the provision of an administrative trial-type hearing and issuance of a formal decision, because those events occurred approximately three years after child neglect was substantiated by a DYFS worker. The concern of J.L. here focuses on the interim period before the hearing when, upon inquiry, J.L.'s case would have been reported as pending. We recognize that the disclosure of such information raises issues as to the applicability of Mathews' factors that have not been addressed either in East Park or M.R. Nonetheless, given the length of time required for a final determination to be made on the issue of abuse or neglect and the consequences of inclusion in the Central Registry during that lengthy periodalbeit in "pending" statusin the appropriate case, a challenge based upon fundamental fairness or constitutional principles may be warranted. However, as we have previously indicated, the record before us is inadequate to permit the proper consideration of such matters here.
In light of our resolution of this matter, we decline to address J.L.'s arguments directed to the delay by the Director in issuing her final decision, to the ex parte nature of the multiple requests for extension, and to the lack of foundation for the representation that extensions were warranted by the complexity of the issues presented. Nonetheless we note the practical effects of this delay upon J.L.'s status as a central registrant, and regard those effects as significant in any future analysis of the constitutionality or fundamental fairness of DYFS's interim procedures.
The final determination of the Director of DYFS is reversed. J.L.'s name is ordered to be removed from the Central Registry and from records maintained by her local police department.
NOTES
[1] After the East Park case arose, DYFS amended its "Support Operations" manual to provide the alleged abuser with a right to request a Regional Dispositional Conference to dispute DYFS's initial findings either at a hearing or at a record and document review. This is the procedure that J.L. elected, with the assurance that her view of the matter would be considered. We were informed at oral argument that Regional Dispositional Conferences have been abolished in light of a backlog of in excess of 3,600 cases. Administrative hearings before an ALJ, unavailable at the time that East Park was decided, provide the present route of appeal.
[2] In this connection we observed that the fact that the teacher had not asserted an interest in changing jobs was of no consequence to the analysis. "The inclusion of her name in the Central Registry is a kind of Sword of Damocles poised above her head. Its clear effect is to inhibit her from even considering any life changes for fear of disclosure." Id. at 163, 714 A.2d 339.
[3] We stated: "Continued use of the informal conference is thus encouraged, so long as the presiding official does not subsequently represent the agency and an adequate record of the conference is made." Id. at 413, 715 A.2d 308 (citing J.E. on Behalf of G.E. v. State, supra, 131 N.J. at 569, 622 A.2d 227).