**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4375-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.A.,

    Defendant-Appellant,

and

A.N.,

    Defendant.

_____

IN THE MATTER OF A.N. and E.N.,

    Minors.

_____

        Argued May 24, 2017 — Decided July 13, 2017

        Before Judges Manahan and Lisa.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Essex County,
        Docket No. FN-07-136-15.

Janet A. Allegro, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Allegro, on the brief).

Joseph Maccarone, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Maccarone, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Vance, on the brief).

PER CURIAM

S.A. appeals from the Family Part's December 9, 2014 order, following a fact-finding hearing, determining that she medically neglected her daughter, E.N., who was born on August 10, 2000. She argues that the court's finding is not supported by substantial, competent, credible evidence necessary for the required finding of gross negligence, the court's statement of reasons was inadequate, and the court's finding of actual harm was speculative and unsupported by the record. The Division of Child Protection and Permanency (Division) and the Law Guardian urge us to reject these arguments. We agree with the Division and the Law Guardian and affirm.

S.A. and her husband, A.N., Sr., have two daughters, E.N. and her older sister by three years, A.N. At all times relevant to

this proceeding, A.N., Sr. was incarcerated.[1]  Although E.N.'s older sister was initially included in the complaint filed by the Division, the litigation was subsequently terminated with respect to her.  She has remained a member of the household at all times.

This case revolves entirely around the medical care provided by S.A. for E.N., who was diagnosed with autism at a very young age.[2]  During her early years, E.N. functioned well and did not exhibit any significant behavioral problems, although she did not have speech.  Beginning at about age ten, following the death of E.N.'s maternal grandfather, she began exhibiting aggressive behavior, which progressively became worse and more frequent, and was directed primarily at her mother.

Beginning in the early part of 2012, when E.N. was eleven years old, a pattern developed regarding S.A's management of E.N.'s behavior.  When severe episodes occurred, which were unmanageable by her mother, S.A. would take E.N. to an emergency room.  E.N.

---

[1]  A.N., Sr. is a party to these proceedings. Counsel was assigned to represent him.  During the fact-finding hearing, his counsel was present and A.N., Sr. participated from prison by telephone. No findings were made with respect to him, and he is not involved in this appeal.

[2]  After S.A. became involved with the Division, she reported at one point that E.N. was diagnosed when she was two-and-one-half years old; at another time she reported the diagnosis was made at age five; in her testimony at the fact-finding hearing, she said the diagnosis occurred when E.N. was four or five years old.

would typically spend an extended period of time there, perhaps twelve to twenty-four hours. She would be restrained and medicated. The medical personnel would then discharge her with instructions to S.A. to follow-up with a primary care physician, more particularly a psychiatrist, who could prescribe appropriate medication to be taken on a long-term basis. Such a physician would also continue to see E.N. on a regular basis, evaluating her, and making any appropriate modifications in the medications prescribed or their dosages, to manage her autism and achieve the best possible results in maintaining her stability.

The first known treatment for E.N.'s autism was at Newark Beth Israel Medical Center in September 2011. On March 25, 2012, S.A. brought E.N. to the emergency room at the Rutgers University of Medicine and Dentistry Hospital of New Jersey (University Hospital), when she was having a severe episode of agitated and combative behavior. This followed an emergency room visit the previous day at Clara Maass Hospital.

Over the next two years, E.N. was brought to the University Hospital emergency room on eleven additional occasions for agitated and combative behavior arising from her autism condition.[3] The Division received its first referral in this matter on June

---

[3] E.N. was also brought to that emergency room on two other occasions for unrelated medical issues.

11, 2013, from Perform Care. The referent reported that S.A. had taken E.N. to the emergency room on multiple occasions due to her uncontrollable bouts of aggression. The referent also indicated that S.A. was not administering medication prescribed to E.N. Further, although it had been recommended by various clinicians that S.A. submit an application for services to the Division of Developmental Disabilities (DDD), she had not done so.

A Division worker met with S.A. and emphasized the importance of utilizing all medical services available to E.N. Over the ensuing weeks, the Division continued to check in with S.A. to assure that she and E.N. would attend a scheduled appointment with University Hospital's behavioral healthcare's crisis clinic. The Division worker also assisted S.A. in completing the necessary paperwork for DDD services. On August 8, 2013, the Division determined E.N. was safe under S.A.'s care.

A second referral was made by E.N.'s school on November 21, 2013, regarding her poor attendance. The Division investigated and concluded that the allegation of educational neglect was unfounded. During these contacts, the Division worker took the DDD application packet from S.A. and sent it to DDD. Apparently, DDD never received the application at that time.

A third referral was made on February 7, 2014, by Dr. Tolga Taneli, the Director of the Child and Adolescent Psychiatric

Division, Department of Psychiatry, at University Hospital, and Lolita Patel, a crisis clinician at University Hospital. They reported that S.A. and E.N. frequently visited the emergency room, but S.A. was apparently not following up with any of the hospital's recommendations. It was also apparent at that time that the DDD application had not been received by the appropriate party. The Division ultimately found the allegation of medical neglect to be established, but not substantiated. See N.J. Div. of Child Prot. & Permanency v. V.E., 488 N.J. Super. 374, 388-89 (App. Div. 2017).

The Division referral that evolved into the present litigation was made in the early morning hours of June 25, 2014, by staff at the Clara Maass Medical Center. It was reported that S.A. brought E.N. to the emergency room because she was being "violent and self-abusive." Emergency room personnel wanted to admit E.N. for seven days of in-patient care, but S.A. refused, saying "the child has been admitted 3 times this year already and it does not help her." The referent indicated that he was familiar with S.A. and E.N. because they had come to the emergency room for similar crisis situations in the past few years.

A Division worker interviewed S.A. When asked whether E.N. was taking any medications, S.A. indicated that E.N. had been admitted at the Trinitas Regional Medical Center for several months in early 2014 and had been prescribed Depakote and Seroquel upon

discharge. However, S.A. stated that she stopped giving E.N. these medications because she believed they were ineffective and were causing side effects that made E.N. more aggressive. Importantly, S.A. acknowledged that she did not consult with any medical personnel prior to stopping these medications for E.N.

Because S.A. would not consent to placing E.N. in in-patient care, a "hospital hold" was invoked. Jesus Carhauchin, a Division worker who had been involved in one of the prior referrals, was contacted and assumed the investigation for the Division. The following day, E.N. was transferred from Clara Maass to Bergen Regional Medical Center. She was discharged from that facility on July 2, 2014, but returned to the emergency room with S.A. later that afternoon due to another onset of violent behavior.

E.N. was referred to Hoboken Medical Center the next day and was transferred there when a bed became available on July 7. On July 10, Carhauchin met with Partnership for Children of Essex (PCE) to discuss future treatment for E.N. At this meeting, it was explained to S.A. that staff from University Hospital, Hoboken Medical Center, Bergen Regional Medical Center, and Trinitas had all recommended that E.N. receive a "Residential Facility Level of Care." S.A. declined to provide her consent, stating that she needed additional time to consider it.

E.N. was discharged from Hoboken Medical Center on July 11, but she became violent and agitated upon arriving home. S.A. took her to the University Hospital emergency room where she was treated and returned home the same day. Following yet another episode, E.N. was taken to Trinitas Hospital emergency room on July 18, and admitted there the next day.

The June 25, 2014 allegation was ultimately substantiated by the Division, which found that S.A. "[d]eprive[d] a child of necessary care which either caused serious harm or created a substantial risk of serious harm." See N.J.A.C. 10:129-7.4(a)6. In its report, the Division referred to Dr. Taneli's July 3, 2014 letter, which explained: "Having gotten to know [E.N.] and her outpatient providers intimately over the past years, our child [and] adolescent psychiatric team concludes that [E.N.] is in need of residential care at this time, if any degree of stability is to be attained."

The Division also found that S.A. refused to consent to pursue this level of care, and the only medical care E.N. had received in the past three years was through her many emergency room visits and hospital stays. The Division determined that S.A. had not been properly administering the medications that E.N. was prescribed. The Division also emphasized how various services, including PCE, Associates Mental Health Disability, Perform Care,

8

and DDD were offered to S.A., but she was non-compliant with their recommendations. Having substantiated the referral, the Division filed for care and supervision of E.N. and her sister on August 5, 2014.[4]

Although we include in the sequence of events the fact that S.A. resisted efforts to secure a residential placement for E.N., that was not the basis for the ultimate finding of medical neglect. Indeed, S.A.'s reason for resisting was her continuing hope that with additional home care services, she would be able to keep her daughter, whom she loves, at home with her. The basis for the medical neglect finding was the long course of conduct, spanning more than two years, during which S.A. repeatedly failed to follow recommendations by medical providers that would have had the best prospect for stabilizing E.N. on a long-term basis.

Instead, E.N. took it upon herself to discontinue medications without medical advice, and failed to establish a relationship with a treating psychiatrist who could see E.N. on a regular basis to assess her condition, monitor and adjust her medications as necessary, and provide such other medical care as would be indicated. This could only be achieved through an ongoing and

---

[4]   On this same date, S.A. provided PCE with verbal consent to begin securing an appropriate residential placement for E.N. E.N. has ultimately been placed in the Bancroft Residential Facility.

stable course of psychiatric care. However, S.A. persistently failed to comply with this advice and these multiple recommendations, opting for crisis management through emergency room visits and emergency admissions. This provided only temporary relief and temporary stabilization of E.N.'s condition. Without the required follow-up, it was inevitable that the cycle would recur, which it did over and over again.

At the fact-finding hearing, the Division presented the testimony of Dr. Taneli and caseworker Carhauchin. The Division also placed into evidence voluminous documentary materials. S.A. testified in her own behalf, but presented no other witnesses.

Dr. Taneli was qualified without objection as an expert in the field of child and adolescent psychiatry. He had personally seen E.N. on a number of her emergency room visits at University Hospital, and he was familiar with the records of all of her other visits there. Dr. Taneli noted that in six of the twelve emergency room visits at University Hospital for aggressive behavior resulting from E.N.'s autism, in-patient treatment was recommended. On four of those occasions, it was accomplished with S.A's consent. On one occasion, a bed was not available. On the remaining occasion, S.A. refused.

Throughout the course of these emergency room visits, the common thread was the recommendation made to S.A. that she obtain

a stable primary care psychiatric physician for ongoing treatment. Dr. Taneli explained that an emergency room is "not a place where treatment can be effectively set up or completed." In an emergency room, a "set of medicines that we end up using are agitation medicines, sometimes injectable medicines or if she agrees by mouth." This will reduce agitation in the short term, but it is not the kind of ongoing treatment that is required to achieve optimum stability. He explained the necessity for ongoing care and medication as follows:

> Q. What is your understanding of [S.A.] giving E.N. medication?
>
> A. I think [S.A]'s relationship or work with the medicines was mostly ambivalent. That is, sometimes she was prepared to go through stretches of medicines. I think sometimes they were helpful. Other times there was a good number of side effects, but in terms of arriving to the ER with an established provider or a stretch of care was missing. That is, throughout the many visits there wasn't, for example, one person who we would identify as the doctor who treats E.N.
>
> Q. And why is that significant when you're talking about a child with autism?
>
> A. Because it interrupted the medicine treatments. It created gaps in prescriptions where it would be -- there would be times of no medicine and it took away the ability to make judgments on benefits and side effects that would then lead to other trials if, for example, treatments failed or if they succeeded, for the continuation of that treatment.

11

. . . .

Q. And this inconsistency, what harm, if any, did that cause to the child?

A. It left her in -- in -- it left her with many visits for aggression that probably would have been reduced if there were stretches of well-being.

Dr. Taneli testified that the record did not indicate that E.N. was getting regular psychiatric care throughout the two-year period during which she had presented at the emergency room on twelve occasions for severely aggressive and agitated behavior caused by her autism. He stated: "Some visits there had been many months of no treatment and other visits there had been months of treatment by some providers then by others." But there had not been a particular doctor that was following her on a consistent basis.

Referring to medical records, Dr. Taneli pointed out that S.A. readily acknowledged on various occasions that she had stopped giving E.N. prescribed medications. Indeed, in her testimony at the fact-finding hearing, S.A. acknowledged that she had no regular primary care psychiatric physician for E.N. over the years. In her testimony, she could not remember what medications had been prescribed from time to time, but she readily acknowledged that,

without medical advice, she often stopped giving those medications to E.N.

At the conclusion of the hearing, the judge rendered his decision. He began by acknowledging that in a case such as this it is necessary "to look at the totality [of] the circumstances as opposed to a particular finite point in time." The beginning point in the judge's assessment was "around 2010 or 2011." He elaborated as follows:

> The child was out of control for a very, very long period of time and there was nothing done but -- except when there was an absolute total crisis bringing the child to the emergency room. That's not treatment. That's calming down a crisis. That's . . . stabilizing the situation, but that's not treatment. That's not ongoing treatment that this child clearly needed.
>
> This child had special needs. I mean, you know, if the child was sick, you wouldn't wait until the child was to the point of dying and bring him to an emergency room. You need to get continuing treatment.
>
> This child had autism. She was having problems in school. She was out of control at school. She was out of control at home. And going to the emergency room every month is not the answer to getting this child consistent treatment. She clearly needed some type -- it seemed to me that she clearly needed medication and there was no consistent medication.
>
> And if there were problems with the medication, there had to be follow-up with doctors. There had to be a doctor following

A-4375-15T3

her that she saw monthly. No one is going to treat her with medication unless she saw a doctor regularly, monthly for medication monitoring.

Nobody is going to give psychotropic medication to anyone without seeing them at least once a month and there wasn't that consistency for this child to make sure she was getting the appropriate meds to stabilize her so that she could manage in school. Maybe some of these hospitalizations and emergency rooms wouldn't have been necessary.

I find there's actual harm here. This child should have been getting regular treatment as opposed to crisis treatment only and that really wasn't enough.

I mean it's very telling when it says "Patient has not been on medications. Was taking Depakote and Seroquel. Dose unknown." Mother didn't know how much since -- she's been on it since April, because mom stopped medication because of a new tremor. Whether or not the tremor was related to medication, there's no showing that she went to a doctor to get off there.

Mom stopped medication on her own because she stated she did not notice any improvements in her behavior. But she didn't get any recommendation from another doctor to change, alter, increase, decrease, change a different medication.

I mean getting medication for a couple of days or a week that the hospital gives you when you go to a hospital, is not regular psychiatric care. This is not the kind of treatment this child needed for years and didn't get.

And I'm sorry, but this -- you know, it came to a head at that point where they said

14

she needs to be immediately put in hospital, but you know, it isn't like this is a big surprise that there's problems. I mean I find that, you know, these issues and these problems -- and [S.A.] seems to be confusing the different dates. I mean I didn't find her a very good historian about what was going on or what took place or who was doing what.

He concluded:

I didn't find her testimony to be -- it was very cogent or helpful to the court in this matter and I do find this was a child that really needed more intensive [treatment] as recommended by the hospital. It was recommended and she never got that kind of treatment that she needed and it created the situation that caused the instability.

. . . .

That's not the way to treat and stabilize a child. I don't find that appropriate. I do find that's medical neglect.

Appellate courts "have a strictly limited standard of review from the fact-findings of the Family Part judge." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). "[A]ppellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Moreover,

15

"[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding."  Cesare v. Cesare, 154 N.J. 394, 413 (1998).  "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

As relevant here, Title 9 defines an "abused or neglected child" as

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in supplying the child with adequate . . . medical or surgical care.
>
> [N.J.S.A. 9:6-8.21c(4)(a).]

The standard in deciding whether a parent has failed to exercise a minimum degree of care is one of gross negligence.  G.S. v. Dep't of Human Servs., 157 N.J. 161, 178-79 (1999).  Parental conduct that is "inattentive or even negligent [does] not meet the requisite standard of willful or wanton misconduct."  N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168 (App. Div. 2009).  A parent may fail to exercise a minimum degree of care where he or she knows of the dangers inherent to a particular situation.  N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J.

Super. 320, 329-30 (App. Div. 2011) (citing G.S., supra, 157 N.J. at 181-82).  This is so because the focus of Title Nine is not on the "'culpability of parental conduct' but rather 'the protection of children.'"  Dep't of Children & Families v. E.D-O., 223 N.J. 166, 178 (2015) (citing G.S., supra, 157 N.J. at 177).

Courts must consider the totality of the circumstances.  N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 39 (2011). We consider whether the child has suffered actual harm and in the alternative, we consider whether there is "some form of . . . threatened harm to a child."  E.D.-O., supra, 223 N.J. at 181 (alteration in original) (citing N.J. Dep't of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013)).

We are satisfied from our review of the record that the judge's findings are well supported by substantial, competent, credible evidence in the record.  This includes voluminous documentary materials, the uncontroverted expert testimony of Dr. Taneli, and S.A's own testimony, in which she acknowledged the very deficiencies which underpin the finding of medical neglect. The record supports the conclusion that consistent primary care psychiatric treatment was required, that emergency room physicians repeatedly recommended to S.A. such a course of treatment, and that S.A. knew or should have known that such a course of treatment was medically necessary for E.N., but she deliberately failed to

17                                                      A-4375-15T3

follow that course.  As a result, E.N. was actually harmed because she could not achieve optimal stabilization of her condition without consistent treatment and medication monitoring.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4375-15T3