# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2392-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

F.J.,

     Defendant-Appellant,

and

M.D.,

     Defendant.

_____

IN THE MATTER OF LANC.D.,
LAND.D., LANG.D., LO.D., SA.D.,
and SO.D., minors.

_____

Submitted December 4, 2024 – Decided March 18, 2025

Before Judges Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0116-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant F.J. (Matthew Van Natten, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae Park, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors Land.D., Lang.D., and Lo.D. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant, F.J.,[1] appeals from a December 21, 2022 order, issued following a "fact-finding hearing,"[2] concluding she "abused or neglected" her children. Because we are satisfied the trial court's findings of fact were adequately supported in the record and are convinced defendant's conduct rose to the level of abuse or neglect, we affirm.

---

[1] We identify the parties by initials to protect confidential information in the record. R. 1:38-3(d)(12).

[2] A "'fact-finding hearing' means a hearing to determine whether the child is an abused or neglected child." N.J.S.A. 9:6-8.44.

2

The fact-finding hearing was conducted over several non-consecutive days. The Division presented testimony of various witnesses. The trial court found the Division's witnesses credible. The trial court noted it observed the witnesses and "had no question that the [Division]'s witnesses were very reliable . . . with regard to what happened." Moreover, the witnesses' testimony was corroborated by photographs.

On the contrary, the trial court found defendant "to be less credible." The court explained it "had concerns about [defendant's] veracity through[out] th[e] proceeding." In addition, the trial court found defendant "tr[ied] to minimize what was going on" and was "not being quite candid with the [c]ourt."

The facts are straightforward and almost entirely undisputed. The Division received referrals regarding concerns for the children in 2014, 2017, and early 2021. The Division offered defendant assistance, but she refused because she did not want to share her children's personal information with agencies. Defendant also did not seek help from her extended family because she did not want to rely on others to help with her children.

In June 2021, defendant was the sole caretaker of her six children ages nine, six, three, two, and twins, eight months. The eldest two children's school contacted defendant because one of the children broke a shoe and needed a

3

replacement. When defendant arrived at the school, she "did [not] seem like herself" and school personnel was concerned that she left the other four children unsupervised. The school contacted the Division with its concerns.

Division investigators arrived at the home at approximately 4:00 p.m. on the day of the referral. After knocking several times, the eldest child answered the door. The eldest child advised that the children were home alone. He did not know how long defendant had been gone, nor when she was returning. The investigators contacted the police.

Upon their arrival, the police had to push the door open because of crates and materials blocking the door. The Division investigator testified that you could not get away from the smell of the home, "[i]t was extremely suffocating."

Once in the home, the investigator observed the twins "on top of their crib, strapped into their car seats." The investigator observed that the home was hot, and the twins were dressed in sweaters and under a cover. The investigators also noticed another child under a cover. The investigator observed the children appeared "[v]ery unkempt."

The investigator decided to take pictures of the conditions of the home. They noticed there were no clear paths in the home because there was trash and

debris throughout. Further, because of the smell, on multiple occasions they had to step out of the home to breathe.

The investigator reported that they observed multiple "safety hazards." The hazards included: (1) broken down refrigerators; (2) crates filled with unknown items; (3) various pots and pans full of dirty water; (4) broken doors; (5) exposed wires; (6) broken windows; (7) soiled diapers and feces; (8) "a tub full of dirty water which appeared to be there for a while as the tub did not drain"; (9) "the fridge and freezer . . . filled with dead roaches and roach droppings"; and (10) piles of dishes. In addition, the investigator testified that they saw: (1) open and accessible cans; (2) a deposit of grease next to the stove that amounted to a "literal[] . . . grease trap"; (3) scattered cans, bottles, and dirty rags; (4) bottles of bleach within the children's reach; and (5) a toilet clogged with feces and an extension cord hanging over the toilet.

The nine-year-old child told the Division's investigators that defendant often left the children alone for extended periods. Further, he did not know how to contact his family or any other adults in the case of emergency. The second eldest child told the Division investigators that defendant often left the home, with the nine-year-old child left in charge.

At approximately 6:00 p.m., defendant arrived at the home. The Division workers and other authorities, police and fire, were still there. Defendant stated that she was only gone for twenty minutes. When confronted with the fact that the Division had been at the home for approximately two hours before her arrival, defendant insisted she was only gone for a few minutes.

Defendant testified the home was not always in the same condition as the day the Division arrived. She explained that the conditions were not her fault as she had been grieving the loss of her mother who passed in 2019. She acknowledged the home was not safe for the children.

While admitting to leaving the children home alone to go to the children's school, she asserted it was only for "[twenty-five to thirty] minutes." Also, she stated she was only gone for a "short time" when the Division arrived. Further, she admitted to leaving the children unsupervised on other occasions but claimed she would ask others to "keep an eye . . . on them."

In an oral opinion, the trial court credited the Division's workers' testimony, and corroborating photographs regarding the hazards in the home. Further, the trial court found "the younger four were left alone when [defendant] was at the school," and later defendant left the children unsupervised before the Division and police arrived at the home. Considering the condition of the home

6

and the ages of the children, the trial court concluded "even the shortest period of time, though, in this kind of case, [it] c[ould not] find that there was any period of time that the children would have been safe left unattended." In addition, the trial court noted that the eldest child had "no way to call for help."

Further, the trial court was "satisfied that [defendant], on a regular basis, left her children home alone and they were absolutely too young and the circumstances of where they were and how they were left were too dangerous." Therefore, the trial court concluded defendant abused or neglected her children.

On appeal, defendant argues the trial court erred in concluding that she abused or neglected her children, because leaving her children home with her nine-year-old son "for twenty minutes" and "twenty-five to thirty minutes on another occasion" did not present a "substantial risk of imminent danger to her children," and "the condition of the home was indicative of poverty rather than lack of care."

The Division counters that: (1) the children were exposed to a substantial risk of harm by being "trapped inside a home filled with hazards, with no safe egress and no plan in the event of an emergency," and (2) while "substandard living conditions . . . are insufficient to support a finding of abuse or neglect," defendant "never called . . . for help, and when [the Division] offered a plethora

7

of services, she largely refused." "These circumstances were not the result of poverty, but of a mother who did not prioritize her children's needs."

The Law Guardian argues "defendant's actions in leaving her children alone in horrific conditions were intentional and more than mere negligence." And "[e]ven if . . . somehow not intentional, her conduct was still grossly negligent." Further, defendant's "conduct in leaving [the children, especially considering their ages,] alone in a home . . . that was full of hazardous conditions placed the children at a substantial and serious risk of harm." In addition, the Law Guardian argues defendant's claim that poverty was to blame should be "rejected" because the Division "had previously made numerous attempts to help the family . . . but [defendant] continually refused them preferring to suffer [rather] than rely on outside help."

Our review of a trial judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12. Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, [we] . . . accord deference to family court fact[-]finding." Id. at 413. Such deference is particularly proper "when the evidence is largely testimonial and involves questions of credibility." Id. at

8

412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "[A] trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Ibid. (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). Therefore, "[w]e will not overturn a family court's fact[-]findings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted).

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "Our review of . . . question[s] of law is de novo." Jeter v. Sam's Club, 250 N.J. 240, 251 (2022).

As relevant here, an "'[a]bused or neglected child' means a child less than [eighteen] years of age,"

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his [or her] parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to

9

be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court . . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

"[T]he phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. Therefore, "[s]o long as the act or omission . . . is done intentionally, whether the actor actually recognizes the highly dangerous character of her [or his] conduct is irrelevant." Ibid. A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates risk of serious injury to that child." N.J. Dep't of Child. & Fams. v. E.D.-O, 223 N.J. 166, 179 (2015) (quoting G.S., 157 N.J. at 181). Whether a defendant's conduct is grossly negligent and, therefore, constitutes abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b), is a question of law, which we review de novo. See Dep't of Child. & Fams. v. T.B., 207 N.J. 294, 308 (2011).

"There is no presumptive age in New Jersey at which a minor may be left unsupervised." Fall & Romanowski, New Jersey Family Law, Child Custody,

10

Protection & Support § 30:2-3(c)(3)(a) (2025). Therefore, matters involving allegations of improper supervision are fact-sensitive. See T.B., 207 N.J. at 309.

In T.B., the New Jersey Supreme Court held there was no abuse or neglect in a situation where "a mother . . . left her four-year-old child unsupervised for two hours under the mistaken belief that his grandmother was home." Id. at 296. The Court stated it was "a close case,"—"plainly negligent"—but the mother did not know "she left her four-year-old son at home alone [with] . . . no adult supervision;" given "the rhythms of [the family's] every-day . . . life" it was "unexpected" that the grandmother was not home; and the grandmother's "car [was] in the driveway." Id. at 309. Instead, the Court found "[w]hat occurred on the date in question was totally out of the ordinary." Id. at 310.

In New Jersey Division of Child Protection and Permanency v. J.C., we reversed a trial court determination that a mother "abused or neglected her . . . three-year-old son" when she "drank alcohol and remained in her bedroom through the following morning with the bedroom door closed, while [the three-year-old] was in the next room unsupervised, wearing a dirty diaper, with the apartment door ajar." 440 N.J. Super. 568, 570 (App. Div. 2015).

We noted the three-year-old "never left the apartment and [the mother] changed his diaper. . . . Further, there was no proof that [the mother] was aware

that her apartment door was left ajar." Id. at 579. Therefore, we explained "there was no proof of harm to [the three-year-old], or that [the mother]'s conduct met the statutory standard of abuse or neglect." Ibid.

In New Jersey Department of Youth and Family Services v. J.L., we considered a mother's appeal from a "final determination . . . that . . . [she] had committed an act of child neglect . . . by failing to adequately supervise her two young sons." 410 N.J. Super. 159, 161 (App. Div. 2009). In J.L., the mother allowed her sons, ages four and six, to walk back to their condominium unattended. The mother

> watch[ed] them as they proceeded . . . into the condominium, which could be viewed clearly from where [she] was standing. The boys did not have to cross any streets to reach their home. . . .
>
> [The mother] had left her front door unlocked, and had trained the boys to leave it ajar if they entered without her. However, on this occasion, the door closed. Because the front inside door knob was equipped with a child-proof cover, the boys were unable to open the door. Believing it to be locked, at 5:38 p.m. the older boy called 9-1-1. At 5:48, the police arrived at the house, knocked, and then opened the door. . . .
>
> In the meantime, [the mother], realizing that the children had not returned . . . commenced to walk home. As she approached her residence, she noticed the police at her door. The . . . [mother] returned at 6:11 p.m.,

12

approximately one-half hour after her son's first 9-1-1 call.

[Id. at 161-62.]

We held that "although arguably inattentive or even negligent, [the mother's conduct] did not meet the requisite standard of willful or wanton misconduct." Id. at 168. "[W]e note[d] that the children were almost four and almost six years of age, respectively. They were returning to a home that was within view of their mother, and they were not required to cross any streets to reach it." Ibid. Further, we stated "[t]he home, itself, was deemed safe . . ., and with the exception of this incident, [the mother]'s conduct toward her children was deemed appropriate." Ibid. In addition, we noted "when confronted with an emergent situation, the older child reasonably determined to call 9-1-1, as he undoubtedly had been instructed to do. These circumstances suggest[ed] that the child exercised good judgment and was well trained by his parents to deal with the crisis that he perceived to exist." Id. at 169.

Applying these well-established principles, we have no reason to disturb the trial court's factual findings. Defendant admitted the home was unsafe and there was substantial evidence in the record to support the trial court's finding that there were hazardous conditions in the home. Moreover, there was substantial evidence in the record to support the trial court's finding that

13

defendant left the children unsupervised on multiple occasions without any means to contact anyone for help.

Under these circumstances, we are convinced defendant's actions were "grossly or wantonly negligent." G.S., 157 N.J. at 178. These circumstances are distinguishable from the "mistaken" and "out of the ordinary circumstances" in T.B.; the "unaware" mother in J.C.; and where the mother could view her children walk to the family's condominium, enter a safe home, and implement the instructed emergency plan in J.L.

Instead, here, defendant knew the house was unsafe and left her very young children without proper supervision. We conclude defendant abused or neglected her children in failing to exercise a "minimum degree of care" "in providing [her] child[ren] with proper supervision" and exposing them to a "substantial risk" of harm. N.J.S.A. 9:6-8.21(c)(4)(b).

Further, we find no merit in defendant's argument that poverty created the circumstances here. Certainly, the "unfortunate incidents of poverty, . . . do not establish child neglect or abuse." Doe v. G.D., 146 N.J. Super. 419, 431 (App. Div. 1976). However, here, it was not poverty that caused the situation, but defendant's refusal to accept the Division's help, and her subjecting her children to acknowledged unsafe and hazardous conditions without supervision.

A-2392-22

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M. C. Harley*

Clerk of the Appellate Division