# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5985-17T2

NEW JERSEY DIVISION
CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.K.,

      Defendant-Appellant,

and

J.T.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.T.
and M.T.,

      Minors.

_____

Submitted May 8, 2019 – Decided May 28, 2019

Before Judges Alvarez and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FN-06-0070-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Janet A. Allegro, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy M. Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

A.K.[1] appeals from a June 20, 2017 order following a fact finding hearing, which determined she committed an act of neglect. We affirm.

We take the following facts from the record. A.K. and J.T. are the parents of A.T. and M.T., who were two and six years old, respectively, at the time of the underlying incident. Both parents have had a drug addiction and a history of involvement with the Division of Child Protection and Permanency (Division). The Division's first contact with the parents occurred in 2015, when it received a referral alleging heroin use and drug-related activity by both parents

---

[1] We use initials to protect the privacy of the children. R. 1:38-3(d)(12).

in the presence of their children. A.K. submitted to urine screens and tested positive for opiates and Sertraline, an anti-depressant. A.K. failed to complete two additional urine screenings and a substance abuse evaluation. J.T. admitted to heroin use, but he was not a caretaker of the children at the time. Therefore, after it provided services, the Division closed its case in July 2016, and concluded the abuse allegations were not established.

In September 2016, the Division received a second referral alleging heroin use by both parents. A.K.'s drug screens were negative and J.T. tested positive for heroin. As a result, on September 30, 2016, the Division implemented a safety protection plan, which required the maternal grandparents to supervise visitation between J.T. and the children. Because of her history of drug use, the Division did not designate A.K. as an approved supervisor. A.K. reportedly became irate when she learned she was not an approved supervisor.

On October 4, 2016, the Division received a third referral alleging J.T. had overdosed on heroin in the presence of A.K. and M.T. The night before, Officer Emanuel Mercado of the Vineland Police Department responded to a 9-1-1 call regarding an overdose taking place in the parking lot of a supermarket. Mercado observed J.T. was unconscious in the front driver's seat of his vehicle as A.K. and M.T. stood outside of the vehicle. Emergency medical services

arrived and administered Narcan to revive J.T. before transporting him to the hospital.

A.K. gave Mercado fifteen wax paper folds and told him J.T had overdosed. Mercado testified he understood the wax paper folds were used to hold heroin. A.K. told Mercado she had driven separately with the children to the supermarket, met J.T., and observed him "walking funny" on the way back to his car, where he then passed out. Mercado surmised from A.K.'s statements that the couple had met to shop together.

Division caseworker Eric Muhalix interviewed M.T. The child stated he was going grocery shopping with A.T., his mother, and father. M.T. reported his grandparents were not present. According to Muhalix's testimony, M.T. heard A.K. state J.T. had overdosed. M.T. also described the overdose. Although he did not enter his father's car, he told Muhalix he was inside his car and "not waking up."

Muhalix interviewed A.K. She admitted she was aware a safety protection plan was in place at the time the incident occurred. She stated J.T. was at her home earlier in the day and had dinner with the family. A.K. denied having an agreement to meet J.T. at the supermarket. She claimed she knew J.T. had to go to the supermarket, based on conversations with him earlier in the day, but

denied any knowledge he was still there when she and her children arrived. A.K. informed Muhalix that her friend, D.A., was present during the incident in the supermarket parking lot.

According to Muhalix's report, A.K. claimed she realized J.T. was at the supermarket when she encountered him in the parking lot. She noticed J.T.'s car and felt "something was not right" when she noticed him stumbling around in the parking lot. When J.T. returned to his car, A.K. claimed she noticed the wax paper folds of heroin in his passenger seat. A.K. then called 9-1-1 when it appeared J.T. was overdosing. As a result of its investigation, the Division implemented a new safety protection plan, which required A.K. to be supervised when she was with the children.

Mercado and Muhalix testified on behalf of the Division at the fact finding hearing consistent with their reports. Mercado testified M.T. appeared scared when he arrived at the scene. Muhalix testified M.T. stated he was scared having seen his father overdose.

D.A. and A.K. also testified. D.A. stated A.K., M.T., and A.T. were at her house during the day of the incident. There, D.A. heard A.K. speaking on the phone with J.T. and telling him she was going to the supermarket, but did not indicate when she would be going. Approximately fifteen to thirty minutes

after the call, D.A. drove A.K. and the children to the supermarket. When they arrived in the parking lot, A.K. noticed a car resembling J.T.'s and then attempted to call him. According to D.A., after J.T. failed to answer, A.K. grew worried and ran over to J.T.'s car, opened the driver-side door, and then ran around to enter through the passenger-side door. D.A. testified M.T. ran over to the car, despite her attempts to stop him, while she remained in the car with A.T. She stated she saw A.K. attempt CPR on J.T. before police arrived.

A.K.'s testimony contradicted her initial statements to Muhalix. Despite her original claim she and her family had J.T. over for dinner on the night of the incident, A.K. testified J.T. was at her home earlier in the day visiting A.T., but left to visit his friend. She claimed after J.T. left, D.A. drove her and A.T. to D.A.'s house. A.K. admitted she had a telephone conversation with J.T. when she was at D.A.'s house and told him she planned to go to the supermarket, but denied telling him to meet her there.

When they arrived at the supermarket, A.K. stated she saw a car resembling J.T.'s and admitted she attempted to call him several times. Contrary to her statements to Muhalix that J.T. had exited his car and was "stumbling around[,]" A.K. stated she approached J.T.'s vehicle and saw him "slumped over the steering wheel." A.K.'s testimony also contradicted her statement to

Mercado in which she claimed she was walking with J.T. when she noticed he began walking strangely back to his vehicle, and then passed out.

A.K. testified that after seeing J.T. slumped over the wheel of his car, she entered the vehicle and noticed he was unable to speak. She screamed his name, attempted to resuscitate him, and shouted "I need to call 9-1-1." A.K. stated it was at this time that M.T. ran over to J.T.'s vehicle.

A.K. denied speaking to Mercado and claimed she spoke with an unidentified female police officer at the scene. She also denied giving Mercado the wax paper folds from J.T.'s car. She claimed she was "unaware" J.T. had a drug problem, but then conceded she knew he previously tested positive for opiates and that a safety protection plan was implemented as a result.

The trial judge concluded both A.K. and J.T. had committed abuse or neglect of M.T. pursuant to N.J.S.A. 9:6-8.21(c)(4). The judge found Mercado had "testified in a[n] honest and direct manner," and was "impressed with his credibility" in recalling the details of his response to the incident. The judge also found Muhalix and D.A. credible.

The judge reached a different conclusion regarding A.K.'s testimony. He found her assertion the incident was the result of a chance meeting with J.T. was not credible. The judge made the following detailed findings:

[A.K.] had been calling and had a conversation with [J.T.] within [thirty] minutes of getting to the [supermarket]. She denies, however, that they were going to meet there. There was no statement to the police officer at any time in her testimony that . . . it was a coincidence that he was [t]here. [Nor did she say she] didn't plan on meeting [him] [t]here[,] but [she] kn[e]w him and [she] recognized him. None of that was stated to the officer. She didn't say it in her testimony that [she] told the officer all of that. She denied, however, that she had planned to meet him there. I cannot find her testimony at all credible. She certainly planned on meeting him there. There was no question to that.

She had called him throughout the day. That was her habit. She had arrived on the scene. She handed over the heroin to the officer. She told . . . Muhalix that. That's contained in the report. She got up on the stand and refuted that and she lied in this court. She did not tell the truth. She told multiple stories. The [c]ourt does not find that [A.K.] is a credible witness on that point.

. . . [S]he did not attempt to correct [Muhalix's] report. She did not attempt to provide any indication that there was inaccuracy in her statements that there was heroin. . . .

. . . I find those to be the credible statement[s][,] not that the officer gets up here and invents these things that [J.T.] was stumbling in, on his way into the [supermarket]. These were statements that were made by [A.K.], I find. He was not simply waiting in the car for her. He was outside the car. He was going to go into the [supermarket]. That was the plan but he couldn't make it in. He had to return. He was suffering

from the effects of the overdose which did take place. He became unconscious. That's what happened.

It is a high degree of inconsistent testimony. It is clearly not believable testimony that has been rendered by [A.K.]

The trial judge concluded:

. . . I do find that the parents, knowing that they were getting together as the credible testimony, knowing that they were in the throws of addiction as is also born[e] out by the testimony, [A.K.] knowing on September 30th [J.T. had tested positive for opiates], and her testimony here acknowledging under oath, . . . that she was aware, she placed him in a grossly negligent fashion by making the plan to be with the dad. And going to the [supermarket], I find is the credible basis here and exposing her children to the use of the drugs and when she went to [J.T.'s] vehicle at that point and [M.T.] wandering or rushing to be at the scene also as identified by . . . Mercado, she is grossly negligent in placing him there.

. . . I find that [M.T.'s] psychological memory here is one which this child need not have to endure for the rest of his life except he now does because of the parties' conduct. That it was one which could have been avoided had she abided by the safety protection plan and not brought her children to [J.T.] She has placed [M.T.] in the imminent danger of becoming impaired, I so find by a preponderance of the evidence.

. . . The shame of it is should they have been able to comply with the drug treatment programs and the safety protection program, they may very well be able to return to the status of a couple and go shopping and do many other things more enjoyable than shopping.

9

> But here they didn't want and did not abide by the safety protection plan[.]

The judge signed the June 20, 2017 order. A.K.'s appeal followed.[2]

## I.

"[W]e generally defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by

---

[2] J.T. does not challenge the trial judge's findings. Likewise, the law guardian has not filed a cross-appeal, but argues "[u]nder Title Thirty, the judge could have issued protective orders to ensure that A.K. did not expose the children to possible harm by their father." We reject these contentions because

> [t]he focus of proceedings initiated under Title 9 is assurance that "the lives of innocent children are immediately safeguarded from further injury[.]" N.J.S.A. 9:6–8.8(a). The focus of a proceeding brought pursuant to Title 30, however, is "whether or not it is in the child's best interest to preserve the family unit," with the child's health and safety being the paramount concern of our Legislature. N.J.S.A. 30:4C-1(a). Thus, a critical distinction between the two proceedings is the sense of urgency of proceedings commenced under Title 9, in contrast to proceedings commenced under Title 30, which may take place over a longer period of time in order to ensure the permanent safety and well-being of a child.
>
> [N.J. Div. of Youth & Family Servs. v. I.S., 422 N.J. Super. 52, 67–68 (App. Div. 2011).]

The record demonstrates the urgency of the Division proceeding under Title 9.

a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011) (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009)). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

We must examine "whether there was sufficient credible evidence to support the trial court's findings." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

On appeal, A.K. argues the judge erred because the record lacks evidence she planned to meet J.T. or acted in a grossly negligent manner by taking the children to the supermarket. A.K. asserts there was no competent evidence to support M.T. knew what an overdose was or that he understood his father was overdosing. A.K. argues the risk of harm was mitigated because M.T. was not

11

inside the vehicle with his father during the overdose. She also contends there was no psychological evidence adduced to prove M.T. suffered an actual harm.

## II.

The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected[.]" N.J.S.A. 9:6-8.44. An "[a]bused or neglected child" includes a minor child:

> whose physical, mental, or emotional condition has been impaired <u>or is in imminent danger of becoming impaired</u> as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, <u>or substantial risk thereof</u>, . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4) (emphasis added).]

"Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." <u>In re Guardianship of DMH</u>, 161 N.J. 365, 383 (1999) (citing <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 616 n.14 (1986)). "[T]he phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." <u>G.S. v. Dep't of Human Servs.</u>, 157 N.J. 161, 178 (1999). Though a past risk of harm is not proscribed by the statute, "a guardian fails to exercise a minimum degree of care

12

when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

"Whether the parent has exercised the requisite degree of care is to be analyzed in light of the dangers and risks associated with the particular situation at issue." N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168 (App. Div. 2009) (citing G.S., 157 N.J. at 181-82). "The inquiry must focus on the harm to the child and 'whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger.'" Ibid. (quoting G.S., 157 N.J. at 182).

A finding of abuse or neglect, requires a trial judge consider "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be "substantial" or the sum of many acts may be "substantial."'" N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div. 2011) (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

We have repeatedly "reiterated the societal concern that no child come under the care of an intoxicated parent." N.J. Div. of Child Prot. & Permanency

v. R.W., 438 N.J. Super. 462, 469 (App. Div. 2014) (citing V.T., 423 N.J. Super. at 331).  However, "not all instances of drug ingestion by a parent will serve to substantiate a finding of abuse or neglect."  V.T., 423 N.J. Super. at 332.

We have stated "parental inaction in addressing past conditions pos[es] a danger to a child [and is] a circumstance pertinent to a finding of abuse or neglect" when a drug-abusing parent is involved.  N.J. Div. of Child Prot. & Permanency v. M.C., 435 N.J. Super. 405, 419 (App. Div. 2014), abrogated on other grounds by N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 189 (2015).  See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281-83 (2007) (finding abuse or neglect where the father refused to provide care to his child separate from the child's mother who posed a serious risk to the child due to her substance abuse problems); see also N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 425–26, 435–36 (App. Div. 2009) (finding abuse or neglect based on the violation of an order prohibiting the father into the home while known to have been actively using drugs).

Here, the totality of the circumstances support the judge's conclusion A.K. failed to exercise a minimum degree of care and exposed M.T. to substantial risk of harm.  Prior to the underlying incident, the Division notified A.K. that J.T. tested positive for opiates.  A.K. was also aware the Division had implemented

a safety protection plan to protect the children from exposure to J.T.'s drug use. Yet, as the judge noted, A.K. "had expressed anger at the Division. She was going to do it her way anyway as she testified here in a very controlling manner in an attempt to have [t]he [c]ourt believe a long, long tale."

The judge noted D.A.'s testimony that A.K. was "constantly texting [J.T.]" The judge concluded "[i]t would appear at this time . . . that [A.K.] was very close in a relationship with [J.T.] She has two children by him and she appeared to be very concerned about him. She was in constant communication."

Indeed, not even a week had elapsed after implementation of the safety protection plan that A.K. exposed the children to J.T.'s drug overdose. A.K. spoke to J.T. within thirty minutes before D.A. drove her and the children to the supermarket. Both A.K. and J.T. knew the other would be at the supermarket that day, yet no attempt to avoid the encounter occurred either before A.K. journeyed there, or even after she arrived and recognized J.T.'s car. The judge found this conclusion was also supported by Mercado's testimony that "[i]t was his recollection [A.K.] planned to meet [J.T.] there. There was no statement of coincidence."

We also reject A.K.'s argument the evidence failed to show M.T. appreciated the harm, had suffered actual harm, or that expert testimony was

required to establish the risk of harm. "[W]e do not require expert testimony in abuse and neglect actions." A.L., 213 N.J. at 29. Moreover, "when there is no evidence of actual harm, the focus shifts to whether there is a threat of harm." E.D.-O., 223 N.J. at 178. "[T]he standard is not whether some potential for harm exists[,]" rather, it is when "[a] parent fails to exercise a minimum degree of care when she is 'aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child.'" Id. at 183-84 (quoting J.L., 410 N.J. Super. at 168-69). "[A] finding of abuse and neglect can be based on proof of imminent danger and a substantial risk of harm." Id. at 178 (quoting A.L., 213 N.J. at 23).

The trial judge found A.K. had acted in a grossly negligent fashion by exposing her children to a substantial risk of harm. The record corroborates the judge's findings. There was evidence of previous drug use by J.T., a safety protection plan implemented by the Division to prevent the children's exposure to drug use, and testimony placing M.T. by J.T.'s vehicle while he was unconscious and overdosed. D.A.'s testimony placed M.T. in the presence of his father and was further corroborated by both Mercado and Muhalix, who testified the child was scared because his father was "not waking up," while his mother attempted to revive him and screamed for help. Considering A.K.'s lack

16

of credibility and inconsistent testimony, and the credible testimony of the other witnesses, the evidence amply supported the judge's findings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5985-17T2