52 A.3d 200

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. S.N.W., DEFENDANT–APPELLANT.

IN THE MATTER OF A.W. AND E.W., MINORS.

Superior Court of New Jersey
Appellate Division

Argued September 19, 2012—Decided October 2, 2012.

248

Before Judges FISHER, WAUGH and ST. JOHN.

*Michael S. Harwin*, Designated Counsel, argued the cause for appellant (*Joseph E. Krakora*, Public Defender, attorney; *Mr. Harwin*, on the brief).

*Tosca Blandford–Bynoe*, Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa*, Attorney General; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Ms. Blandford–Bynoe*, on the brief).

*Phyllis G. Warren*, Assistant Deputy Public Defender, argued the cause for the minor respondents (*Joseph E. Krakora*, Public Defender, Law Guardian, attorney; *Ms. Warren*, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Defendant S.N.W. appeals a determination that her twenty-month old and five-month old children were abused or neglected as a result of defendant appearing inebriated while the children were in her care. Because the trial judge's decision, as limited by his later supplemental opinion, failed to include findings regarding defendant's degree of culpability necessary to a determination that defendant failed to provide a minimum degree of care, we remand for further proceedings and findings.

I

In considering the issues presented in this appeal, we are obligated to explain at some length not only the relatively simple circumstances that generated this action but also the proceedings that followed a temporary remand that we ordered.

A

At a fact-finding hearing on June 6, 2011, to determine whether defendant and her husband abused or neglected their children on October 13, 2010, plaintiff New Jersey Division of Youth and Family Services (the Division)[1] called a police officer and a caseworker to testify.

The police officer testified that, during the morning of October 13, 2010, he responded to a domestic disturbance call and arrived at defendant's home, where he found defendant and her husband in "a heated verbal argument." The officer testified that defen-

---

[1] Effective June 29, 2012, the Division was renamed the Division of Child Protection and Permanency. *L.* 2012, *c.* 16.

dant's husband "appeared to be under the influence of some type of CDS" and was "[j]ust lethargic, [with] slurred speech [and] fumbling actions," and that defendant "also appeared to be under the influence of a CDS, with lethargic actions and slurred speech." The officer then testified that defendant's husband said that he and defendant "had taken [certain medications] not prescribed to them." [2]    Later, during the Division's redirect examination, the officer testified that both parents admitted taking Xanax not prescribed to them—a fact the officer conceded was not contained in his police report.    Both parents were arrested and custody arrangements were made for the two infant children.

The caseworker, who was the second and last witness, testified that she arrived at defendant's home later that day.    Defendant's sister was then caring for the children, who appeared "fine, clean [and] healthy."    While the caseworker was present in the home, defendant arrived in a car she was driving; she was not wearing shoes and "appeared shaky and unstable."    Defendant also "left the car running" but soon realized her mistake and returned to turn off the ignition.

The caseworker acknowledged that defendant was "coherent" but also that she was "shaky, unstable."    The caseworker testified that defendant admitted she had ingested Xanax that day but also that defendant said she had been prescribed Xanax, that the size of the pills prescribed were "the lowest," i.e., 0.25 mg, and that defendant had taken five pills.    The caseworker could not provide the time frame over which the five pills were ingested and the Division made no attempt to elicit that information from any witness. The caseworker testified that she did not believe defendant was in need of medical attention.

Defendant did not testify and called no witnesses.    After closing arguments, the trial judge rendered an oral opinion in which he noted "this is as close a case as you get."    In describing the facts,

---

[2] Defendant's attorney did not object or at least ask that the husband's concession not be admitted as proof in the case against defendant.

the judge observed that it was not known whether defendant or her husband "are regular abusers of Xanax" or "are regularly or continuously in the condition they were found to be on October 13." He found both parents were "toasted" on October 13, in that they were "unsteady on their feet, couldn't speak very well[, and] [w]eren't moving around as if they were normal. They were under the influence." The judge also observed that "by her own admission" defendant had "exceeded the prescription"—because she was limited to taking three pills per day, not five—but he also found that the period of time over which these pills were ingested was not known. In short, the judge could only conclude that defendant "was intoxicated, whatever amount she consumed," explaining further that defendant and her husband

> were intoxicated. They were under the influence. They were unsteady on their feet. They were unable to be normal around their children and provide proper supervision at that window of time that the Division happened to catch them in.

But the judge also found that

> [n]o harm came to the children, that the house was appropriate, clean, the cupboards were properly stocked. The things you need to raise a baby were properly in the house. The children looked as they look here in court today; well cared for and healthy. I make those findings, as well.

For these reasons, the judge concluded that the children were abused or neglected within the meaning of *N.J.S.A.* 9:6–8.21(c)(4).

## B

After this appeal was filed, defendant sought our leave to supplement the record with medical records, which apparently demonstrated that defendant had not taken more Xanax than prescribed. That is, defendant sought leave to show that her doctor had prescribed 0.50 mg Xanax pills that defendant could take three times per day. Defendant argued the importance of this evidence because the record, in the light most favorable to the Division, demonstrated at best that defendant had—during some unknown period of time—taken five 0.25 mg Xanax pills, less than the daily maximum prescribed. Because defendant's trial attorney failed to offer this or other similar evidence at the factfinding hearing, defendant argued in the motion to supplement the record

that her trial attorney was ineffective, citing *N.J. Div. of Youth & Family Servs. v. B.R.*, 192 *N.J.* 301, 929 *A.*2d 1034 (2007). We remanded for a proceeding pursuant to *B.R.* and *Rule* 2:9–1(c).

At the outset of the hearing required by our order, the trial judge considered whether the supplemental information had any bearing on his findings; in short, the judge apparently assumed for argument purposes that the first prong of the ineffectiveness test was met and focused on the second prong, i.e., whether the evidence would have served to defeat the Division's claim. *See B.R., supra,* 192 *N.J.* at 307–09, 929 *A.*2d 1034. The judge explained that he had reviewed the record, as well as his prior decision, and that "given the level of confusion that has arisen in this matter," clarification of his prior opinion was appropriate; he concluded, in discounting the importance of whether defendant had taken more Xanax than prescribed:

> I relied on the testimony of the two live witnesses and I found that [defendant] was intoxicated and not able to provide care for her children based on that testimony. And that was the basis of my finding.

This oral opinion was followed by a written opinion in which the judge further clarified his findings by stating that he had based his earlier decision on "the live testimony" of the police officer and caseworker, and the exhibits, and, with emphasis, declared that he "did *not* take into account the specific amount of Xanax [defendant] ingested at that time." He held that "whether [defendant] had taken more than her prescribed dosage of Xanax" was "irrelevant to determining whether she was intoxicated," and that the only relevant fact was that defendant was "visibly 'intoxicated.'" In that way, the judge determined that the supplemental material would have had no impact on his decision.

II

In appealing the finding of neglect, defendant argues: the insufficiency of the evidence; the lack of a causal connection between defendant's prescription drug use and her ability to care for her children; the Division's failure to show defendant put her

children in imminent danger or substantial risk of harm; the Division's failure to show that defendant's conduct was willful, wanton, or reckless; the judge's finding was based on an incorrect interpretation of the law; and trial counsel's ineffectiveness.

In putting these arguments into context, we first consider the legislation designed to protect children in this setting and how that legislation has been interpreted by our courts in determining whether a child has been abused or neglected.

## A

Title Nine, of course, is aimed at the protection of children from serious harm, whether emotional or physical, as well as the threat of harm. *N.J.S.A.* 9:6–8.8; *Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B.*, 207 *N.J.* 294, 303, 24 *A.*3d 290 (2011); *G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 176–77, 723 *A.*2d 612 (1999). In serving these goals, *N.J.S.A.* 9:6–8.21(c)(4) defines an "abused or neglected child" as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian ... to exercise a minimum degree of care ... in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

Cases of this nature—particularly where no actual harm but only a risk of harm is proven—are quite fact sensitive. The question focuses on whether the parent failed to exercise "a minimum degree of care." *T.B., supra,* 207 *N.J.* at 306, 24 *A.*3d 290.

In an earlier case, our Supreme Court explained that whether a parent "has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation" and that "a variety of factual scenarios can give rise to the finding" of a failure to provide that minimum degree of care. *G.S., supra,* 157 *N.J.* at 181–82, 723 *A.*2d 612. The Court held that "[w]hen a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condi-

tion impaired, that guardian has failed to exercise a minimum degree of care as a matter of law" and that, ultimately, it is for the Division and the courts to determine "on a case-by-case basis" whether a parent has failed to exercise that degree of care. *Id.* at 182, 723 *A*.2d 612.

The Court explained in *T.B.*, that its " 'cautionary act' language ... is informed by" *G.S.*'s "grossly negligent or reckless standard." 207 *N.J.* at 306, 24 *A*.3d 290. That is, "every failure to perform a cautionary act is not abuse or neglect" and "[w]hen the failure to perform a cautionary act is merely negligent, it does not trigger" *N.J.S.A.* 9:6–8.21(c)(4), (b). *Id.* at 306–07, 24 *A*.3d 290. "That focus," as Justice Long explained for the Court,

on the parent's level of culpability in assessing a "minimum degree of care" language is in synchronicity with the Legislature's expressed purpose to safeguard children. Indeed, where a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger. To the contrary, where a parent is merely negligent there is no warrant to infer that the child will be at future risk.

[*Id.* at 307, 24 *A*.3d 290]

Having restated the Legislature's intent in that fashion, the Court then cited with approval examples of the proper interpretation of the abuse or neglect statute, referring to *N.J. Div. of Youth & Family Servs. v. A.R.*, 419 *N.J.Super.* 538, 17 *A*.3d 850 (App. Div.2011) and *N.J. Dept. of Youth & Family Servs. v. J.L.*, 410 *N.J.Super.* 159, 980 *A*.2d 488 (App.Div.2009). *See T.B., supra*, 207 *N.J.* at 307–09, 24 *A*.3d 290. In *A.R.*, we held that a father's placing of his ten-month old son on a twin bed without rails next to a radiator and then closing the door behind him "amounted to gross negligence" because " 'an ordinary reasonable person' would understand the perilous situation in which the child was placed." 419 *N.J.Super.* at 545–46, 17 *A*.3d 850 (quoting *G.S., supra,* 157 *N.J.* at 179, 723 *A*.2d 612). In *J.L.*, we reached a different outcome in the case of a mother of three- and five-year old sons, who "permitted [them] to return home alone ... while [she] remained in the play area." 410 *N.J.Super.* at 161, 980 *A*.2d 488. The children had been trained to leave ajar the door, which was

equipped with a child-proof cover, if they entered without her; on this occasion, the door closed behind them, thereby locking them in and prompting one of the children to call 9–1–1. *Id.* at 161–62, 980 *A.*2d 488. We held that the mother's conduct, "although arguably inattentive or even negligent," did not meet the statutory standard. *Id.* at 168, 980 *A.*2d 488.

The *T.B.* Court utilized our decisions in *A.R.* and *J.L.* to describe the "continuum between actions that are grossly negligent and those that are merely negligent." 207 *N.J.* at 309, 24 *A.*3d 290. Additional content was poured into this fact-sensitive analysis by the circumstances of *T.B.* In that case, the mother of a four-year old child lived with her own mother and stepfather in a ranch home. *Id.* at 296, 24 *A.*3d 290. Mother and child had a space in the home's downstairs portion, which included its own bedrooms, living room, bathroom and kitchen, and the child's grandparents resided in the upstairs portion; the entire house, however, was accessible to the child, who moved freely from one area to the other. *Ibid.* All three adults were employed outside the home, but their respective work schedules provided for times during which the grandparents were able to assist in caring for the child. *Id.* at 296–97, 24 *A.*3d 290. On the occasion in question, the mother and child returned home on an early Sunday evening after visiting other relatives, and the mother put the sleeping child to bed. *Id.* at 297, 24 *A.*3d 290. The mother had also observed that the grandmother's car was in the driveway and incorrectly assumed she was at home because the grandmother was routinely home on Sunday night to prepare for work early Monday morning; based on this assumption, the mother went out to dinner with a friend. *Ibid.* Approximately ninety minutes later, the child awoke and, finding no one at home, became upset, walked out of the home and across the street—a residential street with "constant traffic" governed by a twenty-five-mile-per-house speed limit—to a neighbor's home. *Ibid.* The neighbor called the police, and the mother returned home less than an hour later. *Ibid.*

The *T.B.* Court held that the mother was "intimately familiar with the rhythms of their every-day-family-life" and mistakenly assumed that the grandmother was at home, as was the grandmother's custom. *Id.* at 309–10, 24 *A.*3d 290. Consequently, the Court concluded that what occurred "was totally out of the ordinary" and, in ruling in favor of the mother, explained:

> To be sure, [the mother's] failure to perform the cautionary act of calling upstairs to assure [the grand]mother's presence was clearly negligent. Under all of the circumstances known to her however, it did not rise to the level of gross negligence or recklessness.
>
> [*Id.* at 310, 24 *A.*3d 290]

We lastly note, before examining more closely the case at hand, our decision in *N.J. Div. of Youth & Family Servs. v. R.M.*, 411 *N.J.Super.* 467, 986 *A.*2d 749 (App.Div.), *certif. denied*, 203 *N.J.* 439, 3 *A.*3d 1228 (2010). Although we there considered defendant's entitlement to a suspended judgment, we observed that the defendant-mother created a substantial risk of harm when she "used drugs and alcohol at a time when she was caring for her young children and there was a strong basis to conclude that she would have driven them under those circumstances had she not been prevented from doing so." *Id.* at 481, 986 *A.*2d 749.

B

Our understanding of the facts in this case is confounded by the judge's revisiting of the case following our temporary remand. As noted earlier, we remanded so the judge could consider and make a record on the ineffectiveness claim in light of defendant's allegation that accurate information regarding her Xanax prescription would have been fatal to the Division's case. In response, the judge determined the cause of defendant's condition was irrelevant. As the authorities which we have outlined demonstrate, the judge's conclusion in that regard was erroneous.

The Division, perhaps in appreciation for the lack of specificity in the judge's ultimate ruling, now argues that we should look past the amended findings and credit the evidence that might support the claim that defendant took more Xanax on the date in question

than prescribed. The problem for the Division, however, is that we do not defer to the evidence in the record but to the judge's findings, and the judge ultimately disavowed any finding that may appear or be implicit in his original decision about how much Xanax was taken by defendant. We, thus, examine the judge's legal conclusion that defendant neglected the children by reference to the judge's findings, not by other evidence the judge chose not to rely upon or later disavowed.

As a result, we must conclude that the judge's findings do not support his conclusion that the children were abused or neglected. The Division was required to prove that defendant's condition, as described by the judge in his findings, was produced by a grossly negligent or reckless act.[3] The judge made no finding as to defendant's degree of culpability or, indeed, whether she was culpable at all. Even if we were to assume that the judge's findings suggest he found defendant negligent in engaging in conduct—the ingestion of Xanax—that produced the condition in which she was found by the police officer and caseworker, nothing in the judge's opinion would suggest whether the judge found defendant was merely negligent, grossly negligent or reckless. The judge erred by failing to apply the facts, as he found them, to the principles described in *G.S.* and *T.B.*

### III

For these reasons, the order under review cannot stand. The question that persists, however, is whether we' should simply conclude that the judge's findings do not support the judgment and, therefore, reverse and direct a dismissal of the action as it pertains to defendant, or whether we should remand for additional proceedings. Considering the tortured manner in which the ulti-

---

[3] We assume for present purposes, without deciding, that testimony that defendant was "shaky," unstable on her feet, had slurred speech, or was not "normal," support the conclusion that she was intoxicated or inebriated.

mate findings were produced, simple fairness and the interests of justice require that we mandate the latter.

That is, the Division believes that it had produced evidence to show that defendant abused her Xanax prescription and that her conduct exceeded mere negligence. On the other hand, defendant argues, through the ineffectiveness of her trial attorney, that she did not produce evidence that would show she took no more Xanax than was prescribed to her and, therefore, even if arguably negligent, was not grossly negligent or reckless. The judge's ultimate finding—that the cause of defendant's condition was irrelevant—was erroneous. Accordingly, the record before us contains no finding as to where defendant's conduct fell on the continuum described in *T.B.* by the Supreme Court. In fairness, the parties should have the further opportunity to submit relevant evidence on the issues and thereafter be provided with thorough findings of fact and conclusions based on the legal standard described in the authorities discussed above. The interest of the children in question, whose safety and protection rests at the heart of Title Nine, requires nothing less.

So as not to be misunderstood, we emphasize that we do not necessarily suggest—if it is found that defendant ingested more Xanax than prescribed—that she was grossly negligent or reckless. We assume the parties will offer evidence at the hearing about the amount ingested, the physical effect on defendant depending upon the extent to which she is found—if she is found—to have ingested more than prescribed, whether she accidentally or deliberately took more than prescribed, and her ability to exercise a minimum degree of care in that condition. On the other hand, if defendant is found to have ingested only a pre-scribed amount of Xanax and it is found that she abused no other substances in connection therewith, the legal standard contained in the statute, as described in *T.B.*, would preclude a finding of abuse or neglect.

The judgment under review is vacated and the matter is re-manded to the trial court for additional proceedings in conformity with this opinion. We do not retain jurisdiction.