# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1582-23
A-1583-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.H. and D.G.,

      Defendants-Appellants.

_____

IN THE MATTER OF
F.H.-G., a minor.

_____

        Argued November 14, 2024 – Decided January 17, 2025

        Before Judges Marczyk and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0060-23.

        Caitlin A. McLaughlin, Designated Counsel, argued the cause for appellant L.H. in A-1582-23 (Jennifer Nicole

Sellitti, Public Defender, attorney; Caitlin A. McLaughlin, on the briefs).

Rebekah E. Heilman, Designated Counsel, argued the cause for appellant D.G. in A-1583-23 (Jennifer Nicole Sellitti, Public Defender, attorney; Rebekah E. Heilman, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor F.H-G. (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants L.H.[1] (mother/Lori) and D.G. (father/Don) appeal from the April 19, 2023 Family Part order finding they abused or neglected their then four-year-old son F.H.-G. (Fred), under N.J.S.A. 9:6-8.21(c)(4)(b). Following our review of the record and the applicable legal principles, we affirm.

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

I.

We derive the facts from the record and the trial court's fact-finding hearing, which was conducted over the course of four days in March 2023. The Division of Child Protection and Permanency (Division) presented caseworker Marissa Curcio as a witness. No other witnesses testified.

Fred was born in 2017 to Lori and Don and was four years old at the time of removal. The Division received a referral on October 1, 2022, from the Sayreville Police Department (SPD). The SPD was contacted by Don's father who requested that police conduct a welfare check. Don's father expressed concern because defendants purportedly used heroin, and he had not heard from Don all day. The SPD responded to the home and spoke with Don who appeared "disheveled" and was "wearing dirty clothing" with what seemed to be vomit on it. The officer reported that Fred "appeared to be ok" and that Don stated Fred was sent home from school a few days ago because he was sick.

Later that evening, a worker from the Division's Special Response Unit (SPRU) visited the home to investigate. The SPRU worker found Fred asleep in his bed with no visible injuries. Defendants reported Fred and they were sick with COVID-19. The SPRU worker observed "no concerns nor threats to safety; however, the home appeared extremely hoarded with random items" and

3

"smelled of animal." While speaking with Don, the SPRU worker noted that he "did not nod in and out of consciousness and he did not appear lethargic or withdrawn," nor did he "slur his speech[,] and he spoke clearly and coherently." Don "stated that he [was] sober" and undergoing methadone treatment and denied that Lori had a substance abuse issue.

On October 4, 2022, Division worker Curcio went to the family's home for a follow-up visit. Throughout her visit, Curcio took several photos of the home, Lori, and Don. She testified that she knocked on the door, and after a few minutes, Don answered, appearing very sick and wearing dirty clothes. He vomited in the entryway and proclaimed everyone in the family was sick with COVID-19. Don "appeared confused and slurred his speech a bit but regained his composure after a few minutes." She observed liquid on the floor, which Don explained was vomit, not urine, and he covered it with a towel.

Curcio testified there was a strong smell of animal urine or waste, which she could smell through her face mask. The home was cluttered with clothes piled up; however, there were no fire hazards or blocked walkways. She stated she was concerned about the unsanitary conditions in the kitchen, including bugs flying around the overflowing garbage cans and "splatter" on the walls and floor. The kitchen counters, sink, and tables were all cluttered, and there was no space

4

to prepare or eat food. There was also a rabbit in a cage on the kitchen table. Curcio explained she was concerned that Fred could get sick from the unsanitary conditions in the kitchen.

Curcio recounted that Fred appeared cheerful and was free of marks or bruises. His room appeared clean, unlike the rest of the home. She noted Fred denied being aware of his parents' drug use.

Curcio testified she received training from the Division regarding how to recognize someone under the influence of drugs. She stated Lori was sitting on the couch "nodding off, slurring [her] speech, [heaving,] vomiting and shaking." Curcio recalled she observed "a large open sore on [Lori's] arm that [was] . . . about three to four inches, and it appeared [to be]. . . necrotic or dead tissue. It was very deep and appeared infected." Lori claimed the open sore was the result of a burn mark that became infected; however, Curcio testified she believed the injury was the result of drug use. Based on their shaking, vomiting, slurring words, and visible track marks, Curcio believed that both Don and Lori were under the influence of illegal substances.

Don disclosed to Curcio that he had an opioid addiction and abused heroin and fentanyl. Lori insisted that she was not high and continued to deny drug use. Notably, however, Don stated that Lori was not being truthful, they both

use fentanyl four to five times a day, and they had both used drugs earlier in the day. Don admitted the track marks on his feet were from "shooting up." Curcio maintained that defendants both appeared under the influence—nodding off, slurring their speech, vomiting, shaking, and disoriented. Don told Curcio that he was willing to attend a substance abuse evaluation and treatment. However, Lori refused to attend inpatient treatment due the impact it would have on her job and instead stated she was willing to attend a methadone program.

Curcio recounted that Don further acknowledged that he kept fentanyl in the basement. He took Curcio into the basement. She recalled there was a door leading to the basement, but she could not recall if the door was locked. Once in the basement, Curcio observed a pouch containing needles "out in the open" and a melting spoon on a coffee table. She also noticed a toolbox with latches on a table approximately four to five feet off the ground, where Don explained he stored the drugs. Curcio recalled that the toolbox and pouch were a "few feet from [where] you first entered the basement after going down the stairs." Don told Curcio that he never brought the drugs upstairs, that Fred could not access the drugs, and that he and Lori only used them when Fred was not around.

However, Curcio testified that Fred was about the same height as the table where the toolbox was kept. She stated Don was "struggling and shaking" and

could not locate the drugs in the toolbox; however, she testified that she saw "a bag with something white," but could not be certain whether it was drugs. She testified she was alone in the basement with Don, and because it was a "tense situation," she "quickly" took the photos.

Curcio testified that the environment put Fred at imminent risk of harm, because defendants—who were Fred's sole caretakers—were under the influence at the time of the visit, had ongoing substance abuse issues, and could not adequately respond if Fred ran away or needed medical attention. She further stated that the drugs in the basement placed Fred at imminent risk of harm, as she believed he had access to the basement where the needles were left out in the open. She stated that if Fred touched one of the needles with fentanyl on it, he could "possibly die." She further expressed concern that defendants could die or become incapacitated from an overdose of heroin or fentanyl and not be able to care for Fred in the event of an emergency.

The Division conducted an emergency removal of Fred and placed him with his maternal grandmother. Following its investigation, the Division substantiated Lori and Don for neglect. It based its findings on Fred's young age, Curcio's conclusion defendants were under the influence at the time of the

visit while caring for Fred, the accessibility of drugs, and the unsanitary conditions of the home.

Following the hearing, the trial court rendered an oral decision and issued an order on April 19, 2023, finding by a preponderance of evidence that Lori and Don had abused or neglected Fred. The court found Curcio to be credible and noted that she testified consistently with her report and without exaggerating. The court thus credited her observations and concluded that Lori and Don were under the influence of fentanyl during Curcio's home visit on October 4, 2022.

The court determined "that the statements made by [Don and Lori] can be considered . . . based on the hearsay exception of statements against interest" under N.J.R.E. 803(c)(25). In doing so, the court relied on New Jersey Division of Child Protection & Permanency v. N.T., 445 N.J. Super. 478, 498 (App. Div. 2016), where this court found a mother's statements admissible under Rule 803(c)(25), where the mother admitted to the Division that there was domestic violence in the home, and she was aware this could result in her children being removed. The trial court further explained that "statements that are not directly or obviously self-incriminating can still be admissible as statements against

interest so long as part of the statement strengthens or bolsters the incriminatory effect of the declarant's exposure to criminal or civil liability."

The court also found that Don's statements that he and Lori had used fentanyl earlier that day, and that they abused drugs multiple times a day, were admissible. It noted that Don's "statements, which concern[ed] he and [Lori's] drug use[,] bolster[ed] the incriminatory effect of the exposure to criminal or civil liability," and demonstrated "inherent trustworthiness and reliability" because "[i]t was clear that the Division was there to protect the child," and Don knew "neither parent would be able to care for the child, requiring the Division to take the child." The court also found that Don's statements could be used against Lori, because he "knew . . . there would be no parent to care for his own child, and that [the Division] would have . . . no choice . . . other than to remove the child."

The court found that "even if you . . . take away any statement [Don] made regarding [Lori], . . . a preponderance of evidence proves abuse or neglect regarding" Lori because "there [were] separate and distinct [findings] that would be considered regarding" Lori. Specifically, the court relied on Curcio's observations that Lori appeared to be vomiting, that she could not put a sentence together, was slurring her words, she appeared to be under the influence of an

illegal substance, the conditions of the home, and the paraphernalia observed by Curcio. The court also noted that neither Don nor Lori provided Curcio with any evidence that they were sick with COVID-19.

The court also considered Lori's own statements that she declined inpatient treatment but agreed to methadone treatment. The court pondered "[w]hy would somebody say I'd go to methadone treatment if they weren't somebody who was using drugs?" The court concluded Lori's "statement [agreeing to methadone treatment could] be used . . . separate and apart [from Don's statements] along with [Curcio's] observations . . . against" Lori. Thus, the court found that even without Don's statements, the "totality of the circumstances show that [Lori], too, was under the influence[,]" while a primary caretaker of Fred.

In finding that defendants failed to exercise a minimum degree of care that placed Fred at substantial risk of harm, the court considered the totality of the circumstances. It noted, "both parents were under the influence" when Curcio spoke with them, and "[t]hey were the primary . . . . [and] only caregivers in that home, using [f]entanyl on a daily basis." It noted the parents could not "necessarily deal with an emergency." Moreover, the accessibility of drug paraphernalia in the basement "clearly" put Fred "at a risk of harm." The court

10

also noted the "deplorable" condition of the home and that defendants failed to "maintain a healthy and safe environment" for Fred.

## II.

In the ensuing appeal, Lori raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT'S DECISION THAT [LORI] ABUSED AND NEGLECTED HER CHILD BASED SOLELY ON THE CASEWORKER'S ALLEGATION OF SUBSTANCE USE ON THE DAY OF HER VISIT AND THE HOUSE WAS MESSY, WITHOUT ANY SHOWING THAT THE CHILD WAS HARMED OR PLACED AT SUBSTANTIAL RISK OF HARM BECAUSE OF THESE ISSUES, MUST BE REVERSED.
>
> A. THE TRIAL COURT DID NOT BASE ITS DECISION UPON COMPETENT, MATERIAL, AND RELEVANT EVIDENCE PURSUANT TO N.J.S.A. 9:6-8.46 (b)(1) AND THEREFORE THE DECISION MUST BE REVERSED AS TO [LORI].
>
> B. THE TRIAL COURT ERRED TO CONCLUDE THAT [THE DIVISION] PROVED THAT [LORI] FAILED TO EXERCISE A MINIMUM DEGREE OF CARE.

Don raises the following points on appeal:

POINT I:

THE APPELLATE DIVISION SHOULD REVERSE THE TRIAL COURT'S FINDINGS OF ABUSE AND NEGLECT AGAINST [DON] BECAUSE THEY ARE NOT SUPPORTED BY A PREPONDERANCE OF COMPETENT, MATERIAL AND RELEVANT EVIDENCE AS REQUIRED BY N.J.S.A. 9:6-8.46(b).

A. THE APPELLATE DIVISION SHOULD REVERSE THE INADEQUATE SUPERVISION FINDINGS BECAUSE [DON] WAS NOT GROSSLY NEGLIGENT AND THE TRIAL COURT FAILED TO ACKNOWLEDGE THAT [DON] EXERCISED A MINIMUM DEGREE OF CARE BY TAKING "CAUTIONARY ACTS" TO MINIMIZE RISK OF SUBSTANTIAL INJURY TO [FRED].

POINT II:

THE APPELLATE DIVISION SHOULD REVERSE THE TRIAL COURT'S FINDINGS OF ABUSE AND NEGLECT AGAINST [DON] BECAUSE THEY ARE NOT SUPPORTED BY A PREPONDERANCE OF COMPETENT, MATERIAL AND RELEVANT EVIDENCE AS REQUIRED BY N.J.S.A. 9:6-8.46(b).

A. THE APPELLATE DIVISION SHOULD REVERSE THE TRIAL COURT'S FINDING THAT [FRED] WAS AT SUBSTANTIAL RISK OF HARM DUE TO THE CONDITION OF THE HOME BECAUSE IT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE; IS BASED ON THE OPINION OF AN UNQUALIFIED WITNESS; AND IS FOUNDED ON SPECULATIVE HARM.

B.    THE    APPELLATE    DIVISION    SHOULD
REVERSE THE TRIAL COURT'S INADEQUATE
SUPERVISION FINDINGS BECAUSE THEY ARE
CATEGORICAL    FINDINGS    BASED    ON
INSUFFICIENT    EVIDENCE    AND    A
PREPONDERANCE OF THE EVIDENCE PROVES
THAT [FRED] DID NOT HAVE ACCESS TO DRUGS
AND THAT [DON] WAS ABLE TO CARE FOR
[FRED].

C.    THE TRIAL COURT'S FINDING THAT [DON]
WAS "UNDER THE INFLUENCE" AND UNABLE
TO CARE FOR [FRED] MUST BE REVERSED AS IT
IS BASED ON INSUFFICIENT EVIDENCE AND
THERE IS NO EVIDENCE THAT [DON'S]
CONDITION CREATED AN IMMINENT DANGER
AND SUBSTANTIAL RISK OF HARM.

The scope of our review of an appeal from an order finding abuse or neglect is limited.  N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 546 (App. Div. 2014) (citing N.J. Div. of Youth & Fam. Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008)).  We will uphold the family court's factual findings and credibility determinations if they are supported by "adequate, substantial, and credible evidence."  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). Accordingly, an appellate court will only overturn the court's findings if they "went so wide of the mark that the judge was clearly mistaken."  Ibid.  We do not, however, give "special deference" to the family court's interpretation of the law.  D.W. v. R.W., 212

13

N.J. 232, 245 (2012) (citing N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010)). Consequently, we apply a de novo standard of review to legal issues. Id. at 245-46.

To succeed in a Title Nine, N.J.S.A. 9:6-1 to 9:8-114, fact-finding proceeding, the Division must prove "that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). An "[a]bused or neglected child" is, in relevant part, a child under eighteen:

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

A parent's failure to exercise a minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Fam. v. T.B., 207 N.J. 294, 305 (2011) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999)). Willful or wanton negligence "implies that a person has acted with reckless disregard for the safety of others." G.S.,

157 N.J. at 179. It is "done with the knowledge that injury is likely to, or probably will, result," and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). "However, if the act or omission is intentionally done, 'whether the actor actually recognizes the highly dangerous character of [the] conduct is irrelevant,' and '[k]nowledge will be imputed to the actor.'" N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 144 (App. Div. 2016) (second alteration in original) (quoting G.S., 157 N.J. at 178).

"Because the primary focus is the protection of children, 'the culpability of parental conduct' is not relevant." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 344 (2010) (quoting G.S., 157 N.J. at 177).

> "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., 157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citation omitted).

A-1582-23

[S.G., 448 N.J. Super. at 144-45 (alteration in original) (emphasis added).]

A.

Lori asserts she did not put her child in imminent danger and did not fail to exercise a minimum degree of care required under the statute. She argues the court "relied on evidence which did not rise to the level of preponderance and lacked relevant expert testimony concerning the substance abuse concerns and their potential impact on the child" because the decision "was based solely upon" Curcio's testimony "without any expert testimony concerning [Lori's] alleged substance abuse issues." She reiterates that she never admitted to using drugs.

Lori argues the court never discussed whether Lori was sick with COVID-19 as an explanation for her condition, but instead relied on the testimony of Curcio, who "lacked expertise in determining whether [Lori] had ingested drugs and whether the sore on her arm was the result of injecting drugs versus a burn." Moreover, she claims the Division failed to provide expert evidence that Lori posed a risk to the child by virtue of her alleged drug use and Fred's possible access to drug paraphernalia. She contends there is no evidence she was using drugs on October 4, 2022, because she was never tested. She further maintains, relying on A.L., 213 N.J. at 24, that even if she had used drugs on the day in question, evidence of drug use alone is not enough to show harm. Lori also

16

relies on <u>New Jersey Division of Youth & Family Services v. V.T.</u>, 423 N.J. Super. 320, 332 (App. Div. 2011), for the proposition that "not all instances of drug ingestion by a parent will serve to substantiate a finding of abuse or neglect."

Lori also relies on <u>Department of Children & Families v. E.D.-O.</u>, 223 N.J. 166, 193 (2015), for the proposition that "whether a person is . . . grossly negligent is to be based on the circumstances and facts surrounding the child, rejecting a 'categorical rule' on how a parent must act, and instead focusing on the condition of the child." She asserts that the trial court "fill[ed in] . . . the gaps of [the Division's] evidence with an improper inference of harm" as prohibited by our Supreme Court in <u>A.L.</u>, 213 N.J. at 28.

Finally, Lori argues that the picture of her arm and Curcio's testimony that she believed the wound to be from drug use was insufficient to prove she used illegal substances. She contends that an expert was needed to make such an assertion.

Don similarly argues that the evidence shows he was sick with COVID-19, not under the influence of narcotics. He asserts "[t]he only evidence supporting the court's finding that [he] was under the influence is the unreliable opinion offered by [Curcio], who is not a medical expert or trained clinician."

He contends Curcio was not competent to offer an opinion regarding his intoxication because she was not a qualified expert such as a treatment counselor or licensed clinician with expertise in addiction.

Don also argues that even if he was intoxicated, "there is insufficient evidence to show that his intoxication exposed Fred to peril or imminent danger and substantial risk of harm." He also relies on V.T., 423 N.J. Super. at 331, for the proposition that "Title [Nine] is not intended to extend to all parents who imbibe illegal substances at any time." He cites New Jersey Division of Youth & Family Services v. S.N.W., 428 N.J. Super. 247, 252-53, 257-58 (App. Div. 2012), for the proposition that a parent's intoxication should not result in a finding of abuse and neglect unless the Division proves their condition is the result of gross negligence or that the parent failed to exercise the minimum degree of care in his condition.

The Division and the Law Guardian both cite to State v. Bealor, 187 N.J. 574, 577 (2006), for the assertion that Curcio's lay opinion was appropriately considered by the court in determining whether defendants were intoxicated during the home visit. The Division asserts that "Curcio properly testified regarding her . . . training to recognize signs of intoxication, and her

observations of [defendants] assisted the court in determining whether they were under the influence of drugs, which comports with N.J.R.E. 701."

The Law Guardian argues that "Bealor allows observations by laypersons [regarding] the way in which a person is presenting themselves to prove narcotic intoxication, so long as it is corroborated." The Law Guardian asserts that Curcio's testimony regarding Don and Lori's intoxication was "sufficiently corroborated" by Don revealing the needles and toolbox which he conceded contained drugs, his statement that he and Lori used drugs earlier in the day, Lori's statement that she would undergo methadone treatment, and the track marks Curcio observed on both Don and Lori. The Law Guardian concludes that such "considerations corroborate . . . Curcio's observations of the parent[s'] demeanor and appearance [and] allowed the court to conclude that it was more likely than not that they were under the influence of illicit substances, especially under the lower preponderance of the evidence standard used in Title Nine matters."

We are unpersuaded by defendants' arguments. The court here did not conclude defendants abused or neglected Fred merely because they abused drugs. Rather, the court's findings were based on its conclusion defendants were

under the influence of narcotics while actually caring for Fred when they were his sole caregivers.

This matter is not analogous to V.T., in which the defendant-parent admitted to "using cocaine and marijuana two days prior" to a supervised visit with his child, yet the Division "reported that [he] behaved appropriately at both visits and demonstrated no indicia of impairment" at the visits. 423 N.J. Super. at 326, 331. The defendant in V.T. was allowed supervised visits with his child and tested positive for drugs on two separate occasions, which did not come to light until after each visit. Id. at 325. The Division, which had already filed a complaint for care and supervision under Title Nine for other reasons, subsequently amended its complaint to include allegations that the defendant was under the influence during the visits. Id. at 324-25. The trial court found that the defendant exposed the child to a substantial risk of harm based on the defendant's refusal to attend substance abuse treatment and the positive drug tests. Id. at 327.

On appeal, the defendant argued that the "record lack[ed] evidence to support a finding that the defendant was under the influence of illegal controlled substance when he visited his daughter." Id. at 328. This court acknowledged the two positive drug tests, yet "disagree[d] that such behavior inherently

created a substantial risk of harm." Id. at 330. We found that the defendant "testified he ingested the drugs two days prior to each visit. There [was] no evidence to contradict this testimony" and "use of illegal drugs days prior to a supervised visit does not as a matter of law constitute neglect." Id. at 331. We also noted that the child was not an infant, but a nine-year-old who "was not vulnerable during these visits to the slightest parental misstep." Ibid. We concluded the Division was unable to demonstrate the defendant was "impaired to the point of posing a risk" to his child in a "supervised setting." Id. at 331. Importantly however, this court recognized that a parent should not visit their child while impaired by illegal substances. Ibid.

The trial court's decision here was not based simply on a positive drug test. Rather, unlike in V.T., the court found that Don and Lori used drugs the day Curcio visited, not two days prior. The court further determined defendants used fentanyl four to five times a day when caring for Fred. Curcio testified at length about her observations that defendants were under the influence, and Don himself admitted that he and Lori had used drugs earlier that day.

Furthermore, the court appropriately considered Curcio's testimony regarding defendants being under the influence. In Bealor, the Supreme Court held that "competent lay observations of the fact of intoxication, coupled with

A-1582-23

additional independent proofs tending to demonstrate [a] defendant's consumption of narcotic . . . as of the time of the defendant's arrest, constitute proofs sufficient to allow the fact-finder to conclude, without more, that the defendant was intoxicated beyond a reasonable doubt." 187 N.J. at 577.

The Court further found the trial court was correct to rely "on the aggregate of factual observations of [the] defendant's demeanor and physical appearance together with expert proofs that confirmed the presence of" marijuana in the "defendant's system at the time of his arrest." Id. at 588. Importantly, the Court held that this court's holding "that the nexus between the facts of intoxication and the cause of intoxication can only be proved by expert opinion—impermissibly impinges on the traditional role of the fact-finder and is explicitly disavowed." Id. at 591.

Here, Curcio's testimony regarding her observations of defendants' intoxication was "coupled with additional independent proofs," id. at 577, such as Don's admission to using drugs, Lori's agreement to attend methadone treatment, and Don showing Curcio where he kept the drugs and needles. Furthermore, this case employs a mere preponderance of the evidence standard, not the beyond-a-reasonable-doubt-standard utilized in criminal cases like Bealor, further justifying the court's reliance on Curcio's testimony.

S.N.W. is also distinguishable.  There, the defendant admitted to taking Xanax while caring for her child; however, she argued that she did not take more than was prescribed to her.  428 N.J. Super. at 251.  The trial court held that whether the defendant had taken more than the prescribed amount was irrelevant to a determination that she was intoxicated, because she was visibly intoxicated. Id. at 252.  The trial court also held that "the cause of [the] defendant's condition was irrelevant."  Id. at 256.

We found that the trial court's oral decision did not "suggest whether the judge found [the] defendant was merely negligent, grossly negligent or reckless."  Id. at 257.  This court also determined that the judge's finding "that the cause of [the] defendant's condition was irrelevant – was erroneous."  Id. at 258.  In remanding the case, we stated that a finding that the defendant "ingested only a prescribed amount of Xanax and . . . abused no other substances . . . would preclude a finding of abuse or neglect."  Ibid.  Here, there is no dispute that fentanyl was not prescribed to Don and Lori.  Furthermore, the trial court here gave detailed reasons for its determination that defendants were grossly negligent.

Lori asserts an expert was needed to show her arm injury was the result of drug use.  Even if she is correct, such an error is harmless given the other

substantial evidence showing she was under the influence on the day in question and that Fred had access to fentanyl.  See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

B.

Lori asserts there is no evidence that she used drugs on the day of the October 4, 2022 visit.  She argues that Don's statements that she also used drugs the day of the visit was improperly admitted as statements against interest under Rule 803(c)(25) because she "made no such statement and [Don's] statements did not refer to [Lori]."  Lori also contends the court erred in relying on the fact that she agreed to go to a methadone clinic as an admission that she was abusing drugs.

In reviewing evidentiary rulings, "we afford '[c]onsiderable latitude . . . [to a] trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'"  N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (alterations in original) (quoting N.T., 445 N.J. Super. at 492).  "An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible

basis.'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Rule 803(c)(25) is a hearsay exception and permits the admissibility of a

> statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.

"The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably. . . . Consequently, statements that so disserve the declarant are deemed inherently trustworthy and reliable." State v. White, 158 N.J. 230, 238 (1999).

Further, pursuant to N.J.R.E. 803(b)(1), a "[d]efendant's own statements are admissible as statements of a party-opponent" if the statements are offered against him in the action. N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348 (App. Div. 2016) (citing N.J.R.E. 803(b)(1)).

Here, the trial court correctly admitted Don's statements regarding defendants' use of drugs earlier that day against Don because they were clearly against his interest, and the court found them to be reliable because Don knew

such statements—raising concerns about both parents' condition—could result in the Division removing Fred from the home. The trial court has broad discretion in deciding whether to admit evidence, and we discern no misuse of discretion.

Lori cites no case law for the proposition that once Don's statements were admitted into evidence against him, they could not be used against her as well. Moreover, we previously found a trial court did not abuse its discretion in considering statements against interest made by a mother against her husband in the context of a Title Nine abuse and neglect case under Rule 803(c)(25). See N.T., 445 N.J. Super. at 487, 500. As such, the trial court did not err in relying on Don's statements as against Lori.

Lastly, we find no error in the trial court's use of Lori's testimony that she would agree to obtain methadone treatment. The court appropriately considered the statements under Rule 803(b)(1) as statements by a party-opponent and under Rule 803(c)(25) as statements against interest. Lori was free to argue that she had an ulterior motive in agreeing to undergo methadone treatment, but the court was within its discretion to consider the statement as an admission suggesting she was in fact abusing narcotics.

A-1582-23

C.

Don and Lori both argue that the trial court's finding that the conditions of the home placed Fred at risk of harm was not based on competent, material, and relevant evidence. Don asserts such a finding was "not supported by documentary evidence in the record," and instead "was based solely on" Curcio's testimony. Specifically, Don points to Curcio's testimony that she feared Fred could become sick from the home's condition. He asserts these are speculative harms and are not permitted in finding abuse and neglect. Don cites to New Jersey Division of Youth & Family Services v. S.S., 372 N.J. Super. 13, 26 (App. Div. 2004), where this court refused to "assume . . . that . . . witnessing domestic abuse had a present or potential negative effect on the child sufficient to warrant a finding of abuse." Lori in turn points to the fact that Curcio testified she did not think the conditions of the home, considered alone, presented a risk of harm to Fred. Lori highlights that Fred's room was very clean and that the kitchen was stocked with food.

The Division counters that "Curcio testified that the conditions of the home were unsanitary, with a strong odor of animal waste . . . , bugs around overflowing garbage cans, and clutter throughout the kitchen such that there was no space to prepare food." The Division cites to New Jersey Division of Youth

A-1582-23

& Family Services v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2012), a case involving the termination of parental rights, where we determined "[t]his was not a case where . . . the court viewed drug use in isolation as harming the child. The risk of harm was proven by the entrenched severity of the parents' drug addiction, the negative effect it had on their lives, and the instability of the child's home."

The Division asserts that the home "conditions were demonstrative of the severity of . . . [defendant]s' substance abuse and their inability to provide Fred with a safe environment." It claims that "the court properly concluded that the unsanitary home conditions placed Fred at risk of harm." It contends that even if we do not deem the home conditions placed Fred at risk of harm, "that error is harmless at best and does not undermine the court's finding of abuse and neglect based upon [defendant]s' substance abuse while caring for Fred."

The Law Guardian asserts that "[t]he condition of the home, while not supporting a finding of abuse or neglect independently, was properly considered by the court as an additional factor in evaluating the totality of the circumstances presented."

We conclude the trial court did not view the conditions of the home in isolation. Rather, the conditions of the home were considered in evaluating "the

28

totality of the circumstances." This included the court's determination that Curcio's testimony demonstrated Fred could possibly access the drugs in the basement. Furthermore, even if we were to determine that the conditions of the home were not appropriately considered by the trial court, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Even removing from consideration the court's determination that the home conditions were "deplorable," other compelling evidence sufficiently showed Fred was at a substantial risk of harm.

## D.

Don and Lori argue that the trial court's determination that they failed to exercise a "minimum degree of care" was improper. Don argues that he "exercised a minimum degree of care using and storing drugs in the home and was not grossly negligent." He claims he stored the drugs in the basement in a latched box at a height of "at least three to five feet" off the ground. He also notes he only used drugs "at night" when Fred was not in the "specific area of the basement designed" for such drug use. He asserts that "[t]he court ignored [his] cautionary acts and did not analyze whether [his] use of a lock box to secure drugs was an exercise of a minimum degree of care." He argues that "[w]here

29

there is no actual injury to a child, the legality of the dangerous substance present in a home should not be a factor in evaluating if a parent has been grossly negligent."  Don further contends that he "chose a deliberate course of action to minimize any substantial risk of harm to Fred."  Thus, he asserts that a "preponderance of competent, material and relevant evidence shows that [he] was not grossly negligent because he exercised a minimum degree of care, through several 'cautionary acts.'"

Lori argues that the trial court improperly relied on Curcio's testimony that Fred could access the drugs in the basement when the details surrounding the alleged drugs in the basement did not support a finding that Lori placed Fred at a risk of harm.  She asserts "it would have been extremely difficult for this toddler to gain access to the basement, go down the stairs alone and then find the toolbox with the drugs in it.  In addition, the closed toolbox had latches on it."  She argues that even if her actions are deemed negligent, "they certainly did not rise to the level of grossly or wantonly negligent on the night of the incident. [She] did not act willfully or wantonly when the caseworker visited the home and there is no evidence that she was not properly caring for [Fred]."  She further asserts the entire "family was sick and the house was a mess as a result," and cites Doe v. G.D., for the proposition that the messy conditions of the house "do

not establish child neglect or abuse." 146 N.J. Super. 419, 431 (App. Div. 1976).

She contends "[t]here is no evidence as to [her] alleged drug use that would allow it to form the basis of a legal conclusion that she acted willfully and wantonly." She asserts "there is no evidence that [Fred's] physical, mental or emotional condition was in 'imminent danger of becoming impaired,' nor that [she] had acted wantonly or recklessly" as required by N.J.S.A. 9:6-8.21(c)(4).

The Supreme Court of New Jersey articulated the circumstances in which a parent:

> fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child. . . .
>
> Whether a parent . . . has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation. . . . [T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law.
>
> [G.S., 157 N.J. at 181-82.]

"[E]very failure to perform a cautionary act is not abuse or neglect. When the failure to perform a cautionary act is merely negligent, it does not trigger

[N.J.S.A. 9:6-8.21(c)(4)(b)]."  T.B., 207 N.J. at 306-07.  "[W]here a parent . . . acts in a grossly negligent or reckless manner, that . . . may support an inference that the child is subject to future danger.  To the contrary, where a parent is merely negligent there is no warrant to infer that the child will be at future risk."  Id. at 307.

We affirm substantially for the reasons set forth in the trial court's comprehensive opinion.  The court appropriately determined that defendants failed to exercise a minimum degree of care for Fred.  The court found that both defendants used drugs daily—including earlier that day—and were under the influence when Curcio visited.  The court also found Curcio's testimony reliable to find that Fred had access to the drugs in the basement.  The court determined the toolbox was not out of Fred's reach, and the pouch of needles was unsecure and out in the open.

The court properly considered the totality of the circumstances and made particularized findings to hold that defendants failed to exercise a minimum degree of care and that Don's purported cautionary acts were not enough to shield Fred from a substantial risk of harm.  Don downplays his admission to using drugs earlier that day and his impaired condition.  Moreover, his suggestion he takes heavier doses at night in the basement (while Fred is

presumably asleep upstairs) does not answer how he would be able to adequately respond should Fred have some emergency in the evening.

The record amply supported the court's conclusion defendants failed to exercise the minimum degree of care under N.J.S.A. 9:6-8.21(c)(4)(b) based on their using fentanyl multiple times a day when serving as Fred's only caregivers. Furthermore, they exposed Fred to a substantial risk of harm and imminent danger by the presence of drug paraphernalia to which Fred had access. Defendants were the primary and sole caregivers to a four-year-old boy entirely dependent upon them for his care and safety. The evidence revealed both defendants were actively using fentanyl while caring for Fred, thereby placing him at significant risk.

Finally, to the extent we have not otherwise addressed any of defendants' other arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1582-23